**FILED**

NOV 1 3 2007

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TARA F. BALDRIDGE,         )
formerly known as          )
TARA F. OWENS,             )
on behalf of herself and   )
the classes defined herein, )
                           )
      Plaintiff,     )
                           )    07CV6397
      vs.            )    JUDGE PALLMEYER
                           )    MAG.JUDGE SCHENKIER
PALISADES ACQUISITION XVI, LLC, and )
BLATT, HASENMILLER, LEIBSKER & )
MOORE, LLC,                 )
                           )
      Defendants.    )

## COMPLAINT – CLASS ACTION

### INTRODUCTION

    1.    Plaintiff brings this action to secure redress against unlawful credit and collection practices engaged in by defendants.   Plaintiff alleges violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq. ("FDCPA").   The FDCPA broadly prohibits unfair or unconscionable collection methods;  conduct which harasses, oppresses or abuses any debtor; and any false, deceptive or misleading statements, in connection with the collection of a debt; it also requires debt collectors to give debtors certain information. 15 U.S.C. §§1692d, 1692e, 1692f and 1692g.

### JURISDICTION AND VENUE

    2.    This Court has jurisdiction under 28 U.S.C. §§1331, 1337 and 15 U.S.C. §1692k (FDCPA).

    3.    Venue and personal jurisdiction over defendants in this District is proper because defendants' collection activities impacted plaintiff here.

### PARTIES

    4.    Plaintiff Tara F. Baldridge, formerly known as Tara F. Owens, is a

1

resident of the Northern District of Illinois.

5.     Defendant Palisades Acquisition XVI, LLC is a limited liability company with offices at 210 Sylvan Avenue, Englewood Cliffs, NJ 07632.  It is a wholly-owned subsidiary of Asta Funding, Inc., a public corporation.

6.     Defendant Palisades Acquisition XVI, LLC is engaged in the business of acquiring, holding and enforcing charged-off consumer debts.

7.     Defendant Palisades Acquisition XVI, LLC paid an average of less than 10 cents on the dollar for the debts it purchases.

8.     Defendant Palisades Acquisition XVI, LLC is a plaintiff in more than 100 collection lawsuits pending in Illinois courts.

9.     Defendant Palisades Acquisition XVI, LLC is a debt collector as defined in the FDCPA.

10.     Defendant Blatt, Hasenmiller, Leibsker & Moore, LLC ("BHLM")  is a law firm organized as a limited liability company with offices at 125 S. Wacker Dr., Suite 400, Chicago, IL 60606.

11.     The practice of BHLM consists primarily of collecting consumer debts allegedly owed to others.

12.     BHLM regularly uses the mails and telephones to collect debts.

13.     BHLM is a debt collector as defined in the FDCPA.

## FACTS

14.     On December 11, 2006, an action was filed in the Circuit Court of Cook County, Illinois, by Hawker Financial Corp., represented by BHLM,  against plaintiff, under the name Tara F. Owens, to collect a purported credit card debt.  06 M1 196515.

15.     A copy of the complaint with exhibits is in Appendix A.

16.     The debt was supposedly based on a credit card issued by Providian Bank, which assigned it to "GA Financial Trust," which assigned it to "Arrow Financial Services,"

which assigned it to Hawker.

17.    Any such credit card debt would have been incurred for personal, family or household purposes and not for business purposes.

18.    Any such debt would have been very old. Plaintiff last used the name "Owens" over 10 years previously.

## PROSECUTION OF CLAIM UNDER FALSE NAME

19.    Plaintiff was served with the summons and complaint until on or about May 27, 2007.

20.    The summons and complaint with which plaintiff was served represented that plaintiff owed an alleged debt to Hawker Financial Corp.

21.    In truth and in fact, on May 27, 2007, Hawker Financial Corp. no longer had any interest in the purported debt.

22.    On February 5, 2007, Palisades Acquisition XV, LLC, entered into a Purchase and Sale Agreement ("Portfolio Purchase Agreement") with Great Seneca Financial Corporation, Platinum Financial Services Corporation, Monarch Capital Corporation, Colonial Credit Corporation, Centurion Capital Corporation, Sage Financial Corporation and Hawker Financial Corporation (collectively, the "Sellers"), under which Palisades Acquisition XV, LLC agreed to acquire a portfolio of approximately $6.9 billion in face value receivables ("Portfolio") for a purchase price of $300 million plus 20% of any future Net Payments (as defined in the Portfolio Purchase Agreement) received by the Company after the Company has received Net Payments equal to 150% of the purchase price plus our cost of funds. The Portfolio (now owned by Palisades Acquisition XVI, LLC ("Palisades XVI")) predominantly consists of credit card accounts and included some accounts in collection litigation and accounts as to which the Sellers have been awarded judgments. (Report filed by Asta Funding, Inc., parent of Palisades Acquisition XVI, LLC, on SEC Form S-8, dated April 18, 2007, original page 8.)

23.    A copy of the Portfolio Purchase Agreement is in Appendix B

3

24.    The Portfolio Purchase Agreement expressly recognized (7.1) that "Buyer shall not misrepresent, mislead or otherwise fail to adequately disclose its ownership of the Accounts."

25.    The transaction was consummated on March 5, 2007   (Report filed by Asta Funding, Inc., parent of Palisades Acquisition XVI, LLC, on SEC Form S-8, dated April 18, 2007, original page 8.)

26.    On information and belief, based on the events described below, the purported account that was the subject of the lawsuit against plaintiff was one of the accounts in the Portfolio.

27.    BHLM, on behalf of Palisades Acquisition XVI, LLC, continued pursuing legal action against plaintiff in the name of Hawker Financial Corp. until August 30, 2007, although Hawker  had no interest in any purported claim against plaintiff as of March 5, 2007.

28.    BHLM on behalf of Palisades Acquisition XVI, LLC,  not only continued pursuing lawsuits in the name of Hawker and other selling entities listed in Appendix B  but filed new lawsuits in the name of such entities, all with respect to debts not owned by them, between March 6, 2007 and at least May  15, 2007.

29.    On August 30, 2007, Hawker Financial Corp. filed a motion in 06 M1 196515  to correct a "misnomer" by changing the plaintiff's name from Hawker Financial Corp. to Palisades Acquisition XVI, LLC.  A copy of this motion is in Appendix C.

30.    In fact, there was no "misnomer," but a sale of the claim to an unrelated entity.

31.    By falsely claiming a "misnomer," defendants avoided inquiry into whether they could establish title to the debts in question.

32.    Appendix C is a standard form document filed in hundreds of cases.

33.    Neither Hawker Financial Corp. nor Palisades Acquisition XVI, LLC had any evidence to support any claim against plaintiff. The action was dismissed on the trial date,

4

November 1, 2007 (Appendix D).

### COUNT I – FDCPA – MISREPRESENTATION OF OWNERSHIP OF CLAIM

34.     Plaintiff incorporates paragraphs 1-33.

35.     Defendants BHLM and Palisades Acquisition XVI, LLC violated the

FDCPA by (a) representing that Hawker owned a claim against plaintiff and others similarly

situated, when that was not true, (b) causing litigation to be pursued or commenced in the name

of Hawker and other entities listed as sellers in Appendix B when such entities had no interest in

the claims and (c) misrepresenting that the change from Hawker to Palisades was a "misnomer."

36.     Defendants thereby violated 15 U.S.C. §§1692e, 1692e(2), 1692e(10), and

1692e(14).

37.     Section 1692e provides:

> **§ 1692e.     False or misleading representations [Section 807 of P.L.]**
>
> **A debt collector may not use any false, deceptive, or misleading
> representation or means in connection with the collection of any debt.
> Without limiting the general application of the foregoing, the following
> conduct is a violation of this section: . . .**
>
> **(2)     The false representation of--**
>
> **(A)     the character, amount, or legal status of any debt; . . .**
>
> **(10)     The use of any false representation or deceptive means to
> collect or attempt to collect any debt or to obtain information
> concerning a consumer. . . .**
>
> **(14)     The use of any business, company, or organization name other
> than the true name of the debt collector's business, company, or
> organization. . . .**

### CLASS ALLEGATIONS

38.     Plaintiff brings this claim on behalf of two classes, Palisades and BHLM,

pursuant to Fed.R. Civ.P. 23(a) and 23(b)(3).

39.     The Palisades class consists of (a) all individuals (b) against whom legal

action was taken or pursued (c) on a debt owned by defendant Palisades Acquisition XVI, LLC

(d) under a name of another (such as the entities listed in Appendix B) (e) at any time between

April 1, 2007 and the present.

40.     The BHLM class consists of (a) all individuals (b) against whom legal action was taken or pursued (c) by BHLM (d) on a debt owned by one entity (such as Palisades Acquisition XVI, LLC) (e) under the name of another entity (such as the entities listed in Appendix B) (f) at any time between April 1, 2007 and the present.

41.     Each class is so numerous that joinder of all members is not practicable.

42.     On information and belief, there are at least 40 individuals against whom legal action was pursued on a debt owned by defendant Palisades Acquisition XVI, LLC under a name of another entity, at any time between April 1, 2007 and the present.

43.     On information and belief, there are at least 40 individuals against whom legal action was pursued by BHLM on a debt owned by one entity, such as Palisades Acquisition XVI, LLC, under the name of another entity, such as Hawker Financial or one of the other entities listed as sellers in Appendix B, at any time between April 1, 2007 and the present.

44.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether lawsuits were pursued in the name of an entity that had no interest in the claims and whether doing so violates the FDCPA.

45.     Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

46.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and FDCPA litigation.

47.     A class action is superior for the fair and efficient adjudication of this matter, in that:

    a.     Individual actions are not economically feasible.

    b.     Members of the class are likely to be unaware of their rights;

    c.     Congress intended class actions to be the principal enforcement

6

mechanism under the FDCPA.

WHEREFORE, the Court should enter judgment in favor of plaintiff and the class and against defendants for:

(1)     Appropriate damages, statutory and actual;

(2)     Attorney's fees, litigation expenses and costs of suit;

(3)     Such other and further relief as the Court deems proper.


_____
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Francis R. Greene
EDELMAN, COMBS, LATTURNER
     & GOODWIN, L.L.C.
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)


## JURY DEMAND

Plaintiff demands trial by jury.

_____
Daniel A. Edelman

## **NOTICE OF LIEN**

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

_____

Daniel A. Edelman

Daniel A. Edelman
EDELMAN, COMBS, LATTURNER
      & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

T:\19920\Pleading\Complaint - DAE Pleading.wpd

# APPENDIX A

1619152

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
MUNICIPAL DEPARTMENT, FIRST DISTRICT

HAWKER FINANCIAL CORP.
      Plaintiff

vs.

TARA F OWENS

Case No.: 06M1196515

Amount Claimed: $ 2903.97 + costs

Return Date: JAN 09 2007

Defendant(s)

## COMPLAINT

The Plaintiff, HAWKER FINANCIAL CORP., claims as follows:

1. Plaintiff HAWKER FINANCIAL CORP., is a corporation authorized to do business in the State of Illinois and the Defendant(s) TARA F OWENS is/are a resident of COOK County, Illinois.

2. The Defendant(s) opened a charge account with PROVIDIAN BANK agreeing to make monthly payments as required by the terms of the Charge Agreement, for the purchases charged to the account.

3. Plaintiff is the successor in interest of said account from PROVIDIAN BANK having purchased said account in the regular course of business in good faith and for value.

4. The Defendant(s) did make purchases and charged same to the account but failed to make the monthly payments called for on the account. There is an account stated in the amount of $ 2903.97 (See Client affidavit as Plaintiff's Exhibit No. 1.)

5. Plaintiff declared Defendant(s) to be in default and demands payment of balance.

**WHEREFORE**, the Plaintiff, HAWKER FINANCIAL CORP., prays for judgment against the Defendant(s), TARA F OWENS  , in the amount of $ 2903.97 plus costs.

Blatt, Hasenmiller, Leibsker & Moore LLC - 01237
125 South Wacker Drive, Suite 400
Chicago, IL 60606
(866) 269-9558

## THIS COMMUNICATION IS FROM A DEBT COLLECTOR

BLCCP (02/2003)

6132

*1819152*

## AFFIDAVIT IN SUPPORT OF PLAINTIFF'S CLAIM

**Account Holder:**    TARA F OWENS

**Plaintiff:**    HAWKER FINANCIAL CORPORATION
ASSIGNEE OF PROVIDIAN

**Account Number:**    4031131400474472

BEFORE ME, the undersigned personally appeared and personally known by me, this day, and who after being duly sworn upon his/her oath deposes and states:

1.    I am a competent person over eighteen years of age. I am an employee of

HAWKER FINANCIAL CORPORATION
ASSIGNEE OF ARROW FINANCIAL
SERVICES,
ASSIGNEE OF QA FINANCIAL TRUST
ASSIGNEE OF PROVIDIAN
P.O.BOX 1651
ROCKVILLE, MD 20849

**Ex #1**

, the Plaintiff herein (hereinafter "Plaintiff"). As an authorized agent for Plaintiff, I am authorized to execute this affidavit on behalf of Plaintiff and the information below is true and correct to the best of my knowledge, information and belief.

2.    In the ordinary course of business Plaintiff regularly purchases revolving credit accounts, installment accounts, service accounts and/or other credit lines from the original creditor or their assignee(s).  Plaintiff purchased the credit account of Defendant herein, Account Number referenced above (hereinafter "the Credit Account") from the original creditor or its assignee.

3.    The scope of my job responsibilities includes the supervision or oversight of credit account records maintained by Plaintiff, including the Credit Account referenced above.  In the performance of my duties for Plaintiff, I am familiar with the manner and method by which Plaintiff creates and/or maintains its normal business books and records, including computer records and/or data of its purchased credit accounts, in the ordinary course of its business.  As such, I am the custodian of said business records.

4.    It is also the regular practice of Plaintiff's predecessors to send monthly statements to the accountholders reflecting the purchases made, payments received and/or amounts owing on such accounts.

5.    Plaintiff's business records for the Credit Account of Defendant reflect that the just and true balance due and owing to Plaintiff by the Defendant on the Account Number 4031131400474472    as of the date hereof is $    2903.97 , according to the business records provided to Plaintiff by the original creditor or its assignee at the time the Credit Account was purchased, less credit for all payments, together with interest and other applicable costs as allowed by law.

6.    Demand for payment of the just amount has been made more than thirty (30) days prior hereto and payment for the amount due and owing has not been tendered. There is no record of any legitimate dispute by the accountholder.

**Date:** OCT 0 2 2006

**Signature** *Beverly Berry*

Beverly Berry

**Printed Name**

**Title** ASST. VICE PRESIDENT

STATE OF MARYLAND
COUNTY OF MONTGOMERY

Before me personally appeared the person whose name and title is identified above being of age and duly sworn upon his/her oath, states that he/she has read the foregoing Affidavit and the facts stated therein are true and correct to the best of of his/her knowledge, information and belief.

The foregoing affidavit sworn to and subscribed before me this 2nd day of October , 200 6

Sandra Smith
Notary Public-Maryland
Montgomery County
My Comm. Exp. Jan. 22, 2007

My commission expires:

**Notary Public** *Sandi Smith*

NAFFP2/NAFFP2
NAFFO R7/26/05

**File #:**    163462021    IL21

# APPENDIX B

5 of 5 DOCUMENTS

Copyright 2007 EDGAR Online, Inc.
EDGAR Online

ASTA FUNDING INC

**EXHIBIT TYPE:** EXHIBIT 10 - Material Contracts

**FILING DATE:** February 9, 2007

* * * * * * * * * * COMPANY INFORMATION * * * * * * * * * *

**SIC CODES:**
6153 - Short-term business credit
**INDUSTRY TYPE:** Misc. Financial Services
**SECTOR ID:** Financial

* * * * * * * * * * CONTENTS * * * * * * * * * *

Retrieve All - Form and Exhibits
Retrieve Filing

* * * * * * * * * * TEXT * * * * * * * * * *

Exhibit 10.1 PURCHASE AND SALE AGREEMENT This Purchase and Sale Agreement (the "Agreement") is made as of February 5, 2007, between GREAT SENECA FINANCIAL CORPORATION, PLATINUM FINANCIAL SERVICES CORPORATION, MONARCH CAPITAL CORPORATION, COLONIAL CREDIT CORPORATION, CENTURION CAPITAL CORPORATION, SAGE FINANCIAL CORPORATION and HAWKER FINANCIAL CORPORATION (collectively, the "Sellers," and each a "Seller"), corporations under the laws of the State of Maryland, located at 700 King Farm Blvd., Rockville, Maryland 20850 and PALISADES ACQUISITION XV, LLC ("Buyer"), a Delaware limited liability company organized under the laws of the State of Delaware with its headquarters/principal place of business at 210 Sylvan Avenue, Englewood Cliffs, New Jersey 07632. WHEREAS, the Sellers desire to sell and Buyer desires to purchase certain of the Accounts on the terms and conditions hereinafter provided: NOW, THEREFORE, in consideration of the mutual promises herein, Buyer and Sellers agree as follows:

| | |
|---|---|
| 1. | DEFINITIONS |
| 1.1 | " Account Document(s) " means, with respect to any Account, any application, agreement, billing statement, notice, correspondence or other information in the Sellers' possession that relates to an Account. An Account Document may include, without limitation, original documents or copies thereof, whether by photocopy, microfiche, microfilm or other reproduction process. |
| 1.2 | " Account(s) " means those credit card and other consumer installment credit agreement accounts and receivables (including, without limitation, judgments) listed on the Asset Schedule (attached hereto as Exhibit 1) with outstanding balances of $6,912,428,982.00 which are subject to adjustment as of the Cutoff Date (as defined below) in accordance with Section 2.2. |
| 1.3 | " Affiliate " means, when used with reference to a specified Person, any other Person who directly controls, is controlled by, or is under common control with, the specified Person. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person that is a corporation, limited liability company, partnership, trust, or other entity, whether through ownership of voting securities or interests, by contract, or otherwise.. |
| 1.4 | " Closing Date " means Friday, February 16, 2007, or such other date mutually agreed to by Buyer and the Sellers provided that Buyer shall have the continuing right to postpone the Closing Date until a date on or before March 31, 2007. |
| 1.5 | " Cutoff Date " means 8 PM Friday, February 2, 2007, provided that if the Closing does not occur until after March 5, 2007 as a result of Buyer's decision to postpone the Closing Date and due to no fault of Sellers, the Cutoff Date shall be deemed to be the Closing Date . |
| 1.6 | " Cutoff File " means the electronic file containing the file of the Accounts actually purchased by Buyer on the Closing Date reflecting activity as of the Cutoff Date. |
| 1.7 | " Debtor " means the person or persons in whose name(s) an Account was established. |
| 1.8 | " Diligence File " means the electronic file containing information relating to Seller's accounts delivered by, or on behalf of, Sellers to Buyer on, or about, January 25, 2007. |
| 1.9 | " Litigation " means any action, proceeding, claim, lawsuit, arbitration, audit, hearing, or investigation commenced, brought, conducted, or threatened by or before, or otherwise involving, any governmental authority or any third party, other than any routine collection action instituted by, or on behalf of, a Seller or any action instituted to execute a lien against the assets of a Debtor. |
| 1.10 | " Person " means any individual, corporation, partnership, joint venture, limited liability company, trust, governmental authority, or other entity. |
| 1.11 | " Purchase Price " means $300,000,000.00, subject to Pre-Closing Adjustment pursuant to Section 2.2. |
| 1.12 | " Purchase Price Percentage " means that percentage obtained when the Purchase Price is divided by the total outstanding Account balances as of the Cutoff Date. |
| 1.13 | " Sellers' Knowledge " means the actual knowledge, without investigation, of any Seller, its Affiliates, agents or representatives. |
| 2. | PURCHASE AND SALE OF ACCOUNTS |
| 2.1 | Purchase and Sale . On the basis of, and subject to, the representations, warranties and covenants of the Buyer contained in this Agreement, the Sellers agree to sell, assign and transfer to Buyer, and Buyer agrees to purchase from the Sellers, on the Closing Date all right, title and interest of Sellers in the Accounts. Buyer has made an independent investigation, as it deems necessary, as to the nature, validity, collectibility, enforceability and value of the Accounts, and as to all other facts that Buyer deems material to Buyer's purchase. Buyer enters into this Agreement solely on the basis of that investigation and Buyer's own judgment. Buyer has made an independent determination that |

1

the Purchase Price represents the Accounts' fair and reasonable value. Buyer acknowledges that the sale and assignment are without warranty of any kind; including, without limitation, warranties pertaining to validity, collectibility, accuracy or sufficiency of information, except as stated in Article 3 below; and is without recourse to the Sellers except as

2

specifically set forth within the Agreement. Buyer further acknowledges that it is not acting in reliance on any representation by the Sellers, except as set forth in Article 3 below.

2.2                                                    Pre-Closing Adjustment . The Purchase Price amount stated in Section 1.6 shall be adjusted as follows:

The Sellers shall prepare a final statement of Accounts as of the Cut Off Date ( the "Closing Statement"). The Sellers may retain any Account if (i) the Sellers determine, in their sole discretion, that as of the Cut Off Date the representations set forth in Section 3.3 are not true and correct with respect to such Account; or (ii) the Sellers determine, in their sole discretion, that there is a pending or threatened suit, arbitration, bankruptcy proceeding or other legal proceeding or investigation relating to such Account, or the Debtor of such Account, naming the Sellers or otherwise involving the Sellers' interest therein in a manner unacceptable to the Sellers, or the Sellers otherwise determine, in their sole discretion, that such matter cannot be resolved and/or that the Sellers' interest therein cannot be adequately protected without the Sellers owning such Account, provided that in either case the Sellers shall, if requested by Buyer, in writing describe such suit or investigation in detail reasonably acceptable to Buyer. The Purchase Price will be decreased by an amount equal to the product of (i) outstanding balance as of the Cut Off Date of any such retained Account and (ii) the Purchase Price Percentage. The Sellers shall notify the Buyer of the adjusted Purchase Price on or prior to the Closing Date. Sellers shall have a right to provide replacement accounts for those retained as Pre-Closing Adjustments of comparable value.

2.3                                                    Payment .

(a)                                                    On the date hereof Buyer shall, by wire transfer of immediately available funds, make a deposit of $60,000,000.00 (the "Deposit") to Sellers, jointly, which shall be held by Sellers as a deposit subject to the terms and conditions of this Agreement and shall be refundable only as provided in section 13.1 of this Agreement. To the extent, if any, that Sellers are required to return the Deposit to Buyer, Sellers shall be jointly and severally liable for the return of the Deposit. If Closing has not occurred by February 16, 2007 at 1pm, Buyer shall make an additional deposit of $15,000,000.00 to be held by Sellers subject to the terms and conditions of this Agreement and shall be refundable only as provided in section 13.1 of this Agreement.

(b)                                                    Subject to satisfaction or waiver of the conditions precedent set forth in Article 5 of this Agreement, on or before 3:00 P.M., Eastern Time on the Closing Date, Buyer shall pay, by wire transfer of immediately available funds to an account, or accounts, specified by the Sellers, an amount equal to the Purchase Price minus the Deposit. The Sellers will be deemed to have simultaneously transferred, and

3

shall simultaneously transfer title to the Accounts to Buyer in accordance with Section 2.4 below.

(c)                                                    After Buyer has received Net Payments from the Accounts equal to 150% of the Purchase Price, Seller shall be entitled to 20% of future Net Payments. Buyer shall provide monthly reports in a form and content reasonably satisfactory to the Seller and remit to Seller, on a monthly basis, Seller's 20% of Net Payments earned during the prior month. Seller may, at its sole expense, audit Buyer upon reasonable notice and during normal business hours, to determine Buyer's compliance. For purposes of this clause, " Net Payments " shall mean all collections and proceeds on Accounts received by Buyer from any source, less any costs and fees of collection or sales, disgorgements and amounts equal to the cost of funds to Buyer and its Affiliates in financing the Purchase Price To the extent that Buyer pays a brokerage fee in excess of 10% for the sale of accounts, said excess shall not be counted against the above Net Payment calculation.

2.4                                                    Transfer . Simultaneously with payment of the Purchase Price, the Sellers and Buyer will execute and deliver to each other a Bill of Sale substantially in the form of Exhibit 2. The Sellers will provide to Buyer, on the Closing Date, or at such other time as is mutually agreed to by the Buyer and Sellers , a computer printout or magnetic tape (the " Closing Tape ") listing the Accounts as of the Cutoff Date that were purchased by the Buyer containing the information set forth on the attached Exhibit 4. On the Closing Date, Sellers will, by means of the aforesaid Bill of Sale and this Agreement, transfer all Sellers' right, title and interest in the Accounts and Buyer will accept same and assume, with respect to each Account, all of Sellers' rights, responsibilities, liabilities and obligations with respect to such Accounts. Sellers shall also deliver executed Powers of Attorney in the form attached as Exhibit 5 and such other transfer documents as Buyer shall reasonably require on at least 48 hours notice prior to the Closing.. If the Sellers receive any payments of principal and/or interest by or on behalf of any Debtor with respect to an Account between the Cutoff Date and the Closing Date, Sellers shall hold such amounts in trust for Buyer and pay over such amounts to Buyer, without interest thereon, within seven (7) days after the Closing Date. If payments are received by the Sellers from a Debtor on or after Closing Date, the Sellers shall forward such payments, without interest thereon, to Buyer within seven (7) days from date of receipt. Buyer may, at its sole expense audit Sellers and their Affiliates and agents upon reasonable notice during normal business hours to determine Sellers' compliance.

2.5                                                    Notices, Regulatory Filings and Fees, Sales, Use or Transfer Taxes . If any notices, regulatory filings or fees, sales, use, transfer or other tax is required or assessed or otherwise is or becomes required or payable as a result of the transactions contemplated hereby, Buyer shall assume the obligation to provide such notices, make such regulatory filings and pay such filing fees and tax, to the extent such taxes relate to, or accrue on or after the Closing Date.

3.                                                    REPRESENTATIONS AND WARRANTIES OF THE SELLERS

4

3.1 Due Organization; Authorization; Litigation . Each Seller makes the following representations and warranties as of the date hereof and as of the Closing Date: (a) The Sellers are duly organized, existing and in good standing under the laws of the State of Maryland and the Seller's corporate powers, performance, delivery, and performance of this Agreement are within the Seller's corporate powers and have been duly authorized by all necessary corporate action. The execution and delivery of this Agreement by Seller and the performance of its obligations hereunder will not (i) conflict with or violate (A) the organizational documents of Seller, or (B) any provision of any law or regulation to which Seller is subject, or (ii) conflict with or result in a breach of or constitute a default (or any event which, with notice or lapse of time, or both, would constitute a

default) under any of the terms, conditions or provisions of any agreement or instrument to which Seller is a party or by which it is bound or any order or decree applicable to Seller or result in the creation or imposition of any lien on any of its assets or property. Seller has obtained all consents, approvals, authorizations or orders of any court or governmental agency or body, if any, required for the execution, delivery and performance by Seller of this Agreement. No Litigation is pending or to Seller's Knowledge threatened involving (i) any Seller that relates to any Accounts or (ii) any Seller or its assets that, if adversely determined, could have an adverse effect on this transaction or the value of Accounts having an aggregate face amount of $5,000,000 or more or a material adverse effect on any Seller's financial condition. (e) Sellers have not utilized any investment banker or finder in connection with the transaction contemplated hereby who might be entitled to a fee or commission upon consummation of the transactions contemplated in this Agreement which might in any way or amount be the responsibility of the Buyer or be a claim against, or with respect to, any Accounts. 3.2 Representation As To Ownership and Assignability . Each Seller makes the following representations and warranties as to its Accounts as of the date hereof and as of the Closing Date: (a) Seller has good and marketable title to the Accounts, is the sole owner thereof and has full right to transfer and sell the Account free and clear of any encumbrance, equity, lien, pledge, charge, claim, security interest, obligation to third party collection agencies or attorneys. (b) Seller has the right to assign the Accounts without the consent of any Person and subject to no continuing duties or restrictions under any purchase agreement to which a Seller or any predecessor in interest is a party, except for any obligation specifically set forth in this Agreement. (c) The Accounts have been originated, and have been maintained, collected and serviced by a Seller and its predecessors in interest and their respective agents and5

Affiliates, in full compliance with applicable state and federal laws including, without limitation, the Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, and the Fair Credit Billing Act. (d) The cashflow reports delivered by Seller to Purchaser for the period of twelve months prior to the Cutoff Date accurately reflect the gross cash flow and collection activity with respect to the Accounts. (e) All collection agents, servicers, attorneys and other persons who have any claims with respect to efforts to collect on any Accounts have been paid in full and no such claims, disputed or undisputed, are outstanding, and no collection agents, servicers, attorneys and other persons have any right to refuse to release the Accounts to Purchaser free of any lien or claim, immediately upon Seller's request. (f) The Accounts listed in the Diligence File in the "pre-litigation", "pre-judgment" and "judgment" categories, respectively, were properly listed in those categories as of the date of the Diligence File. (g) That as of the date of the Diligence File, the "statute of limitations models" used by Sellers in the ordinary course of business indicate that the applicable statute of limitations period for instituting litigation has not expired for the Accounts listed in the "pre-litigation", "pre-judgment" and "judgment" categories of the Diligence File. Notwithstanding this representation, Buyer agrees that it shall be responsible to determine the applicable Statute of Limitations for all accounts in the sale. (h) Seller's inability to obtain agreements, applications or other media with respect to any Accounts that are listed in the "pre-litigation" and "pre-judgment" categories of the Asset Schedule will not have a material adverse affect on Buyer's ability to collect the portfolio of Accounts purchased from a Seller. (i) All Accounts are closed and there are no requirements for future advances of credit or other performance by Seller. 3.3 Representations Concerning Accounts . With respect to each of its Accounts, except for those Accounts listed as "Specials", "Bankrupt" and "Deceased in the Diligence and Cutoff Files and the file used to calculate and prepare the Closing Statement, each Seller represents and warrants that to the best of Seller's Knowledge, as of the Cutoff Date:

| | |
|---|---|
| (a) | the balance of the Accounts as will be reflected on the Closing Tape is correct; |
| (b) | the Accounts are valid and duly enforceable in accordance with their terms; |
| (c) | the debt represented by the Account has not been satisfied and/or the stated balance on such Account has not been paid; |
| (d) | the Accounts were not created as a result of fraud or forgery such that all of the Debtors have no liability for such Account; |
| (e) | the Debtor has not been released from liability on the Account; |
| (f) | except as noted in the Diligence File and the Cutoff File used to calculate and prepare the Closing Statement, the Debtor has not filed bankruptcy nor have all of the Debtors' liability relating to the Account been discharged in bankruptcy; and |
| (g) | except as noted in the Diligence File and the Cutoff File used to calculate and prepare the Closing Statement, all of the Debtors are not deceased. |

G

No Seller makes any representations or warranties, express or implied, with respect to any of the other Accounts other than as specifically set forth in this Section 3.3 and Section 3.2, including specifically, but not by way of limitation, any representation or warranty regarding any information in any due diligence file given to and reviewed by Buyer regarding Sellers' analysis of whether or not any Account is within any applicable statute of limitation such that legal action to collect same would be permitted by law. 3.4 Solvency . Each Seller represents and warrants that its sale of Accounts to Buyer and its obligations under this Agreement: (a) were not made in contemplation of its insolvency of any Seller; (b) were not made with the intent to hinder, delay or defraud the respective creditors of any Seller; (c) will be recorded in the records of such Seller and such records will be continuously maintained by that party; and (d) represents a bona fide and arm's length transaction undertaken for adequate consideration in the ordinary course of business.
3.5                                    Remedies for Breach of Representations Concerning Accounts .

| | |
|---|---|
| (a) | Time Period. Buyer's sole remedy against Sellers for a breach of any of the representations listed in Section 3.3 (individually, a "Breach" and collectively, "Breaches") shall be as set forth in this Section 3.5(a). Buyer shall have no remedy for any Breaches to the extent Breaches have occurred that relate to Accounts having aggregate outstanding balances of $30,000,000.00 ("Breach Threshold"). Buyer must notify the Seller of Breaches in excess of the Breach Threshold (any such Breaches being referred to as "Compensable Breaches") no later than 120 days from the Closing Date. Seller shall have, at its option, the right to (i) cure such Compensable Breach in all material respects, (ii) repurchase the affected Account(s) by paying Buyer the Purchase Price Percentage multiplied by the outstanding balance of such Account(s) as shown on the Closing Tape. A Notice of Claim under this Section 3.5 must be delivered by the Buyer to the Seller in writing and accompanied by the documentation required under Section 3.5(b). Notwithstanding anything in this Agreement to the contrary, the Buyer's failure to provide a Notice of Claim within the applicable time period in accordance with this Section 3.5(a) and 3.5(b) with respect to any claimed Compensable Breach of Seller shall terminate and waive any rights Buyer may have to any remedy for such Compensable Breach under this Agreement. Notwithstanding anything in this Agreement to the contrary, this Section is not intended to limit Buyer's rights and remedies under Section 10.2 with respect to claims and other matters asserted by third parties. |
| (b) | Form of Notice Required. Buyer shall notify Seller in writing of each Account that Buyer claims to be a Compensable Breach by Seller as set forth above ("Notice(s)"). All Notices shall contain the customer's name and applicable Seller's account number and shall be accompanied with at least the following applicable documentary evidence reasonably satisfactory to the Seller: |

Bankruptcies: Credit Bureau with non-dismissed bankruptcies, or

Attorney name, case number, and date of filing, or

Copy of actual court papers, or approved third party service

(Banko, Inc.; Experian; Trans Union; or Equifax)7

Deceased: Copy of death certificate, or

Credit bureau indicating date of death, or

Executor or attorney letter with date of death, or

approved third party service (Banko, Inc.; Experian; Trans

Union; or Equifax) Settled or

Paid in Full: Copy of Seller letter verifying action

Copy of the canceled, final check (front and back) Fraud: Letter from or to Seller or Seller's agent

Complaint in writing explaining event Seller shall make a determination within thirty (30) business days after receipt of Buyer's Notice, unless Seller's delay in responding is caused by or related to Buyer's failure to provide Seller with necessary information and documentation required under this Section 3.4.

(c)    Repurchase Price . If the Seller elects to either repurchase the Accounts or reimburse the Buyer in the amount of the Purchase Price Adjustment as set forth in Section 3.4(a)(ii), the Seller shall not be obligated to make payment on an Account by Account basis, but may elect to provide such adjustment in a single payment within 30 days of notification, at Seller's option. The Seller makes no representation as to the number of Accounts that may be subject to repurchase pursuant to this section.

**4.**                    REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer makes the following representations and warranties as of the date hereof and as of the Closing Date:

4.1    Due Organization; Authorization . Buyer is duly organized, existing and in good standing as a limited liability company under the laws of the State of Delaware. Buyer has full authority to execute, deliver and perform this Agreement according to its terms.

4.2    No Conflict . Buyer's review of Account and Debtor information will not represent a conflict of interest on the part of Buyer or Buyer's officers or employees. The execution and delivery of this Agreement by Buyer and the performance of its obligations hereunder will not (i) conflict with or violate (A) the organizational documents of Buyer, or (B) any provision of any law or regulation to which Buyer is subject, or (ii) conflict with or result in a breach of or constitute a default (or any event which, with notice or lapse of time, or both, would constitute a default) under any of the terms, conditions or provisions of any agreement or instrument to which Buyer is a party or by which it is bound or any order or decree applicable to Buyer or result in the creation or imposition of any lien on any of its assets or property. Buyer has obtained all consents, approvals, authorizations or orders of any court or governmental agency or body, if any, required for the execution, delivery and performance by Buyer of this Agreement.

8

4.3    Investigation of Accounts . Buyer is a sophisticated investor and its bid and decision to purchase the Accounts are based upon its own independent expert evaluations of the nature, validity, collectibility, enforceability and value of the Accounts. The Buyer has had sufficient opportunity to complete the independent investigation and examination into the Accounts that Buyer deems necessary. Buyer enters into this Agreement solely on the basis of that investigation and Buyer's own judgment. Buyer has made an independent determination that the Purchase Price represents the Accounts' fair and reasonable value. Buyer is not acting in reliance on any representation by the Sellers, except those representations and warranties specifically given in Section 3.3.

4.4    Accounts Sold As Is . Buyer acknowledges and agrees that except for the warranties and representations set forth in Section 3.3 of this Agreement, Sellers have not and do not represent, warrant or covenant the nature, accuracy, completeness, enforceability or validity of any of the Accounts and any supporting documentation to the extent provided by Sellers to Buyer either before or after the date of this Agreement; specifically including, but not by way of limitation, any information in any due diligence file given to or reviewed by Buyer regarding Sellers analysis of whether or not any Account is within any applicable statute of limitation such that legal action to collect same would be permitted by law] and, subject to the terms of this Agreement, all documentation, information, analysis and/or correspondence, if any, which is or may be sold, transferred, assigned and conveyed to Buyer with respect to any and all Accounts are sold, transferred, assigned and conveyed to Buyer on an "AS IS, WHERE IS" basis, WITH ALL FAULTS.

4.5    No Finders . Buyer has not utilized any investment banker or finder in connection with the transaction contemplated hereby who might be entitled to a fee or commission upon consummation of the transactions contemplated in this Agreement which might in any way or amount be the responsibility of the Sellers.

**5.**    CONDITIONS PRECEDENT TO PURCHASE AND SALE OF ACCOUNTS

5.1    Representations and Warranties . The representations and warranties of the Sellers and Buyer in this Agreement will be true and correct in all material respects as of the Closing Date.

5.2    Compliance with Covenants and Agreements . Buyer and the Sellers will have complied in all material respects with each of their respective covenants and agreements in this Agreement on or before the Closing Date.

5.3    No Violation of Law . Consummation by Buyer and the Sellers of the transactions contemplated by this Agreement and performance of this Agreement will not violate any order of any court or

governmental body having competent jurisdiction or any law or regulation that applies to Buyer or the Sellers.

5.4    Approvals and Notices . All required approvals, consents and other actions by, and notices to and filings with, any governmental authority or any other person or entity will have been obtained or made. If Buyer is a corporation, Buyer will have delivered to the Sellers a certificate from Buyer's corporate secretary, or other documentation satisfactory to the Sellers and its counsel, certifying that Buyer's board of directors has resolved or consented to Buyer entering into this Agreement and consummating the transactions contemplated hereby. Seller shall have delivered secretary's certificates together with certified charter documents, resolutions and lists of incumbent officers as well as an opinion of outside counsel, all in form and substance satisfactory to Buyer.

5.5    Material Change In Financing Market . No Material Adverse Change or Force Majeur has occurred prior to February 24, 2007 which would cause Buyer to be unable to pay the remaining amounts owed at the time of Closing. For purposes of this paragraph, "Material Adverse Change" means any closing of the United States securities markets or banks, or any banking moratorium, or any change, effect, event, occurrence or development which individually or in the aggregate would reasonably be expected to be materially adverse to the United States banking, financial or securities markets including but not limited to any change, effect, event, occurrence or development (1) related to or arising from the commencement, occurrence, continuation or intensification of any war, armed hostilities or acts of terrorism, or (2) related to or arising from changes in laws, rules or regulations of general applicability or applicable to the industry in which the parties operate or interpretations thereof by any governmental entity. Force Majeure means acts of God or of the public enemy, fire, flood, storm, explosion, earthquake, riots, wars, hostilities, civil commotion, strikes, interruption of supply, inability to obtain fuel, power, raw materials or freight or transportation services, equipment or transmission failure or damage reasonably beyond Buyer's control, or other cause reasonably beyond Buyer's control.

5.6    Closing Scrub. Sellers shall have performed a "Banco" or similar bankruptcy "scrub" with respect to the Accounts within seven (7) days of the Cutoff Date and shall have properly classified on the Cutoff File all Accounts that are reported to have Debtors that are subject to bankruptcy proceedings.

6.    RIGHTS AND OBLIGATIONS OF THE SELLERS AND BUYER

6.1    Notice to Debtors, Etc . At Buyer's reasonable request, the Sellers will provide a form letter, in form and substance satisfactory to Buyer, that Buyer may, at Buyer's sole expense, reproduce, address and send to a Debtor to confirm that the Sellers sold the Debtor's Account to Buyer. The Sellers shall have the right to review and approve, which approval will not be unreasonably withheld, all written notices sent by the Buyer to the Debtor informing the Debtor of the transfer of the Debtor's Account to the Buyer. Seller shall also, promptly upon Buyer's request, send notices to each attorney, collection company servicer or other person collecting any Account of the transfer of the Debtor's Account to Buyer. The Buyer shall not discredit or impugn the reputation of any Seller

in any correspondence sent to the Debtor in connection with the Accounts purchased by the Buyer.

6.2    Retrieval of Account Documents . After the Closing Date, the Sellers will furnish Buyer at no charge with any Account Documents in Sellers' possession that Buyer reasonably requests within three (3) years of the Closing Date. Sellers will also use commercially reasonable efforts to obtain from prior owners and/or the credit originator directly any Account Documents that Buyer requests and which Sellers are entitled to obtain, at Buyer's sole expense which will be equal to the actual out of pocket cost(s) incurred by the Sellers in obtaining the Account Documents. Except in instances of litigation unrelated to collection activity or accounts that are within the statute of limitation at the time requested, the Sellers will have no obligation to provide Buyer with or cooperate with the Buyer in obtaining Account Documents after three (3) years after the Closing Date.. Buyer's request for an Account Document must be presented to Sellers on a form provided by Sellers and must be made with sufficient specificity to enable the Sellers to locate the Account Document. The Sellers will use reasonable diligence to provide the Account Document. Notwithstanding any other provision of this Agreement, the failure of the Sellers to provide an Account Document requested by Buyer will not be a breach of this Agreement.
Buyer may, in addition or in the alternative to its request for Account Documents, request an Affidavit from Sellers, in the form shown in Exhibit 3, indicating the date the Account was opened or acquired, the Account number and the balance existing as of a specified date to the extent that said information is available to the Sellers. The Sellers will provide a total number of affidavits equal to ten percent (10%) of the total accounts purchased. Sellers shall have three (3) weeks to complete the affidavits requested unless the requests exceed 10,000 affidavits in such case Sellers shall have a reasonable period of time to complete the request. Sellers agree to cooperate with Buyer to complete affidavit requests in a shorter time on an occasional basis. Requests shall contain sufficient information about the relevant accounts to allow Sellers or its representatives to locate the Account information to complete the affidavits.

6.3    Credit Bureau Reporting . The Buyer may report its ownership of the Accounts to any of the credit reporting agencies provided that the Buyer agrees to and does comply with the Fair Credit Reporting Act (FCRA) and any other laws or regulations governing credit agency reporting. Sellers warrant and represent that the information provided to Buyer regarding charge-off and last payment date information is accurate, true and correct to the best of each Sellers Knowledge based upon information provided to each such Seller at the time of their purchase.

6.4    Compliance with Law . With respect to any Account, Buyer or Buyer's agent will at all times: (a) comply with all state and federal laws applicable to debt collection, including, without limitation, the Consumer Credit Protection Act, the Fair Credit Reporting Act and the Fair Debt Collection Practices Act, and (b) for any Account where the statute of limitations has run, not falsely represent that a lawsuit will be filed if the Debtor does not pay.

6.5     Post Closing Account Review . Prior to initiating any contact, whether verbal, written or electronic, with a Debtor, Buyer shall review the portfolio through a competent third party vendor (e.g., Bankro, Inc.) or other process to discover whether any Accounts included are involved in an open bankruptcy case or have been discharged in bankruptcy. Buyer shall immediately cease any collection efforts upon receiving notice, whether from the Debtor, the Sellers, or a third party on behalf of the Debtor, that a Debtor has discharged the debt in bankruptcy, and shall not re-commence collection activity until Buyer has conducted a reasonable investigation into the Debtor's claim and determined, based upon reasonable evidence, that the Debtor's claim is unfounded.

6.6     Notice of Claims . Buyer will use its reasonable efforts to notify the Sellers promptly of any claim or threatened claim against the Sellers or any claim or threatened claim that may affect the Sellers, that is discovered by Buyer. Each Seller will use its reasonable efforts to promptly notify the Buyer of (i) any notice it receives that an Account is subject to Bankruptcy protection and (ii) any claim or threatened claim against Buyer, or that relates to any Account or any claim or threatened claim that may affect Buyer or relate to any Account.

6.7     Seller As Witness . If Buyer, upon reasonable written notice to a Seller, requests or subpoenas an officer or employee of Seller or its predecessors in interest, Affiliates or their respective agents to appear at a trial, hearing or deposition concerning an Account to testify about the Account, Seller shall use commercially reasonable efforts to ensure the requested employee appears at such hearing or deposition and will be available for consultation with Buyer. Buyer will pay Seller for the officer's or employee's time in traveling to, attending and testifying at the trial, hearing or deposition, whether or not the officer or employee is called as a witness, at the hourly rate equivalent of such officer or employee. Buyer will also reimburse Seller for the officer's or employee's reasonable out-of-pocket, travel-related expenses.

6.8     File UCC-1 . Upon Closing, Buyer shall be permitted to file UCC-1 financing statements in appropriate jurisdictions against Seller describing this transaction relating to this transfer of any Accounts.

6.9     Prior Purchase Agreements If requested by Buyer, Sellers shall promptly deliver to Buyer all prior purchase and sale agreements relating to any Accounts ("Prior Purchase Agreements"), bills of sale, UCC-1s and other transfer documents that relate to any Accounts.. Sellers shall retain all of those documents that are in a Seller's possession or control for at least seven (7) years from the Closing. Sellers hereby assign to Buyer all rights to be indemnified, be defended and be held harmless, and all rights to obtain documents, media and other information, with respect to any Accounts under any Prior Purchase Agreement to which any Seller is a party or has rights, provided however that any such right is assignable and Buyer may only exercise any such right if Sellers fail to exercise such right after reasonable request from Buyer.

12

7.     USE OF SELLERS' OR PREDECESSOR'S NAME

7.1     Use of Names . The Buyer will not use or refer to the Sellers' names, the name of any prior owner of the Account or of the original creditor of the Account, except to reference same for purposes of identifying an Account in communications with the Account's Debtor, in collecting amounts outstanding on the Account, and in conducting litigation or participating in a bankruptcy proceeding with respect to the Account. Buyer shall not represent that there is an affiliation or agency relationship between Buyer and any Seller, nor shall Buyer state or represent in any way that it is acting for or on behalf of any Seller. Buyer shall not misrepresent, mislead or otherwise fail to adequately disclose its ownership of the Accounts.

7.2     Breach . Buyer's breach of this Article 7 will result in actual and substantial damages to the Sellers, the amount of which will be difficult to ascertain with precision. Therefore, if Buyer breaches this Article 7, Buyer will pay the Sellers any actual damages and attorney's fees incurred by Sellers caused by Buyer's breach of this provision.

8.     THE SELLERS' RIGHT TO REPURCHASE ACCOUNTS

8.1     Accounts Affected . Sellers shall have the right to repurchase any Accounts that have not been paid in full, released or compromised by Buyer, if the Sellers determine that there is a pending or threatened suit, arbitration, bankruptcy proceeding or other legal proceeding or investigation relating to an Account or a Debtor naming any one or more of the Sellers or otherwise involving the Sellers' interest therein in a manner unacceptable to the Sellers, or the Sellers otherwise determine, in its/their sole discretion, that such matter cannot be resolved and/or that the Sellers' interest therein cannot be adequately protected without the Sellers owning such Account.

8.2     Right to Repurchase .

(a)     Upon notice to Buyer, a Seller may repurchase any Account described in Section 8.1 by repaying to Buyer an amount equal to the product of the outstanding balance of such Account and the Purchase Price Percentage and, if requested by Buyer, Sellers shall promptly provide to Buyer a detailed written explanation of Sellers' reason for any such repurchase..

(b)     Upon delivering to the Seller a full accounting of the Account, Buyer may retain any money or value that Buyer collected or received on the Account before Buyer's receipt of the Seller's notice electing to repurchase the Account; provided that, after Buyer has received the Seller's notice, Buyer will immediately cease releasing or compromising the Account.

9.     RIGHT OF RESALE

13

9.1     Sale or Transfer to a Third Party . Buyer may resell or transfer the ownership of any Account to any third party, including the transfer of Debtor information (such as names and addresses) to any third party, (each referred to as "Third Party Buyer"); provided, however, that Buyer must conduct commercially reasonable and prudent due diligence of the Third Party Buyer to assure with reasonable certainty that said Third Party Buyer will be able to and has agreed to comply with the relevant terms and conditions of this Agreement. Buyer shall defend, indemnify and hold harmless Sellers from any and all causes of action, claims, expenses or judgments incurred by Sellers for which Buyer's Third Party Buyer or any buyer of Third Party Buyer (collectively referred to herein as "Downstream Buyer") is solely or partially responsible. Buyer shall require all Downstream Buyers to agree to be bound to all of the Buyer's obligations and limitations or remedies, and to

acknowledge all of Sellers' rights set forth in this Agreement. All Downstream Buyers' requests for documentation pursuant to Section 6.2 must be made to Sellers through Buyer, unless Sellers otherwise agree in writing. Nothing in this Section 9.1 shall modify the indemnification provisions between Sellers and Buyer as set forth in Article 10 of this Agreement.

**9.2** Exceptions . Notwithstanding the terms and conditions of Sections 9.1 and 12.5, Buyer may pledge the Accounts and its rights under this Agreement as collateral for a loan and for the purpose of obtaining financing secured by such Accounts as long as Buyer remains bound by, and any purchaser remains subject to, the relevant obligations, terms and conditions of this Agreement. Buyer shall remain obligated under, and shall retain all liabilities related to, this Agreement if it transfers, hypothecates or pledges all or any of the Assets or its rights hereunder.

**10.** INDEMNIFICATION

**10.1** Indemnification by Buyer . Buyer hereby agrees to indemnify, defend, and hold harmless the Sellers, and their respective shareholders, subsidiaries and Affiliates, and all of their respective officers, directors and employees, attorneys and collection agencies, from and against any and all claims, damages, losses, costs or expenses (including any and all reasonable attorneys' and experts' fees), asserted by a third party (collectively, "Losses") that Sellers might suffer, incur or be subjected to by reason of any legal action, proceeding, arbitration or other claim, whether commenced or threatened, whether or not well grounded and by whomsoever concerned, based upon any breach of this Agreement, or any other act or omission by Buyer and its Affiliates, and their respective its officers, directors, agents, employees, representatives or any Downstream Buyers with respect to any Account or any party obligated on an Account after the Closing Date; provided, however, that, (i) the Sellers notify Buyer within a reasonable period of time of any such Losses (provided that any failure to notify the Buyer within such reasonable period of time shall not affect the obligations of the Buyer to indemnify the Sellers hereunder unless the Buyer is prejudiced by such failure), (ii) such Losses are not primarily attributable to any negligent act or omission by any Sellers, their parent, Affiliates or subsidiaries, predecessors in interest or any of the employees or agents of any of the

**14**

following, and (iii) the Sellers provides Buyer with information that is available to the Sellers and is reasonably necessary for Buyer to prosecute its defense of the action.

Buyer shall bear all expenses in connection with the defense and/or settlement of any such claim or suit. The Sellers shall have the right, at its own expense, to participate in the defense of any claim against which it is indemnified and which as been assumed by the obligation or indemnity hereunder; Buyer, in the defense of any such claim, except with the written consent of the Sellers, shall not consent to entry of any judgment or enter into any settlement that either: (a) does not include, as an unconditional term, the grant by the claimant to the Sellers of a release of all liabilities in respect of such claims, or (b) otherwise adversely affects the rights of the Sellers.

**10.2** Indemnification by Seller . Subject to the provisions of Section 3.5, Sellers jointly and severally hereby agree to indemnify, defend, and hold harmless the Buyer, its parents, subsidiaries and Affiliates and predecessors in interest, and their respective officers, directors and employees, from and against any and all Losses, whether asserted by a third party or otherwise that Buyer might suffer, incur or be subjected to by reason of any legal action, proceeding, arbitration or other claim, whether commenced or threatened, whether or not well grounded and by whomsoever concerned, based upon any breach of this Agreement, or any other act or omission by any Sellers, its Affiliates and predecessors in interest and their respective officers, directors, agents, employees, or representatives with respect to any Account or any party obligated on an Account prior to the Closing Date, provided, however, that (i) the Buyer notifies Sellers within a reasonable time of any such Losses (provided that any failure to notify the Sellers within such reasonable period of time shall not affect the obligations of the Sellers to indemnify the Buyer hereunder unless the Sellers are prejudiced by such failure), (ii) such Losses are not primarily attributable to any negligent act or omission by the Buyer, its parent, Affiliates, subsidiaries, transferees, contractors, agents or any of their employees or agent and (iii) the Buyer provides Sellers with information that is available to the Buyer and is reasonably necessary for Sellers to prosecute its defense of the action. Notwithstanding the foregoing, Sellers are not responsible for any breach of the representation in Section 3.2(e) with respect to the origination or predecessors in interest of any Account, except to the extent that a Seller has any right to be indemnified, defended or held harmless for such matters. Sellers shall bear all expenses in connection with the defense and/or settlement of any such claim or suit. The Buyer shall have the right, at its own expense, to participate in the defense of any claim against which it is indemnified and the defense of which has been assumed by the Sellers' obligation or indemnity hereunder. Sellers, in the defense of any such claim, except with the written consent of the Buyer, shall not consent to entry of any judgment or enter into any settlement that either, (a) does not include, as an unconditional term, the grant by the claimant to the Buyer of a release of all liabilities in respect of such claims, or (b) otherwise adversely affects the rights of the Buyer.

**10.3** Survival . The representations and warranties of the Sellers set forth in Section 3.3 shall survive the Closing Date for a period of 120 days thereafter, and all other representations and warranties of the Buyer and the Sellers shall survive the Closing Date until expiration of the applicable statute of limitations. The covenants and agreements of each party

**15**

hereunder shall survive in accordance with their terms, or, if not specified, until expiration of the applicable statute of limitations.

**10.4** Limitation of Liability . Notwithstanding anything to the contrary herein, Sellers shall not be liable in respect of any Losses arising from any breach of the representations and warranties set forth in this Agreement unless and until the aggregate cumulative amount of Losses claimed hereunder exceeds $100,000.00 (the "Deductible"), in which case Sellers shall be liable only for such excess over the Deductible .

**10.5** Continuing Insurance . Sellers agree to maintain insurance after Closing for a period of 3 years at Seller's current insurance levels as of the Cutoff date and will specifically identify Buyer and its

10.6    affiliates and successors and assigns as a "Loss Payee" and provide evidence of compliance with this provision as and when Buyer shall reasonably request.

Further Assurances . On and after the Closing Date, Sellers shall (i) give such further assurances to Buyer and shall execute, acknowledge and deliver all such acknowledgments, assignments, instruments, pleadings and notices, and take such further action, as Buyer may reasonably request to effectively vest in Purchaser the full legal and equitable title to, and the right to collect and otherwise have control of, the Accounts and the proceeds thereof (including without limitation, judgments and collections), free, clear and unencumbered of liens, claims and other restrictions, and to effectuate the purposes of this Agreement; and (ii) use its best efforts to assist Buyer in the orderly transition of the Accounts. Should any Seller fail to take any such action after reasonable notice from Buyer, (without limiting any other rights and remedies available to Buyer) Buyer shall have the right to take such action whether in Buyer's own name or in a Seller's name pursuant to the Power of Attorney provided by such Seller to Buyer.

10.7    Post-Closing Assurance. For two years after the Closing Date, Sellers shall (i) continue their existence, solvency and good standing and (ii) cause Great Seneca Financial Corporation, Platinum Financial Services Corporation and Centurion Capital Corporation, on a combined basis, to maintain a net worth of at least $10,000,000, provided that to the extent the net worth is less than $10,000,000 Sellers may provide a letter of credit in the amount of that deficiency from a bank and in form and substance reasonably acceptable to Buyer to secure all obligations of Sellers under this Agreement or a guaranty from another entity reasonably acceptable to Buyer. Sellers shall upon request of Buyers provide evidence of compliance with this covenant in form reasonably acceptable to Buyer.

16

11.   **CONFIDENTIALITY**
11.1   Confidential Information . From and after the execution of this Agreement, and except as required by applicable law, Buyer hereto shall keep confidential, and shall use reasonable efforts to cause their respective officers, directors, employees and agents to keep confidential, any and all information obtained from the Sellers concerning the assets, properties and business of the Sellers, and shall not use such confidential information for any purpose other than those contemplated by this Agreement; provided, however , that Buyer shall not be subject to the obligations set forth in the preceding sentence with respect to any such information provided to it by the Sellers which either (i) was in Buyer's possession at the time of the Sellers' disclosure, (ii) was in the public domain at the time of the Sellers' disclosure, or subsequently enters the public domain through no act or failure to act on the part of the Sellers, or (iii) is lawfully obtained by Buyer from a third party. Nothing in this Agreement shall be construed to limit Buyer's obligations under any other confidentiality agreement entered into between Buyer and the Sellers.

11.2   Public Announcement . Neither Buyer nor the Sellers shall make any public announcement of this Agreement or provide any information concerning this Agreement or the subject matter hereof to any representative of the news media without the prior written approval of the other party. Except as required by law, the parties will not respond to any inquiry from public, governmental, or administrative authorities concerning this Agreement without prior consultation and coordination with each other.

12.   **GENERAL PROVISIONS**
12.1   Applicable Law . The laws of the State of Delaware shall govern the enforcement and interpretation of this Agreement and the rights, duties and obligations of the parties hereto.

12.2   WAIVER OF JURY TRIAL . NOTWITHSTANDING ANYTHING STATED HEREIN, IF EITHER PARTY BRINGS ANY ACTION AGAINST THE OTHER PARTY, WHETHER AT LAW OR EQUITY, REGARDING THE OTHER PARTY'S PERFORMANCE UNDER THIS AGREEMENT OR BRINGS ANY ACTION CONNECTED IN ANY WAY WITH THIS AGREEMENT, THE PARTIES AGREE TO WAIVE TRIAL BY JURY.

12.3   Notices . All notices or other documents required to be given pursuant to this Agreement shall be effective when received and shall be sufficient if given in writing, hand delivered, sent by overnight air courier or certified United States mail, return receipt requested, addressed as follows:

17

If to Seller:

Thomas A. Henning, Esq.

General Counsel Personal & Confidential

702 King Farm Blvd. 5 th Floor Rockville , Maryland 20850

If to Buyer:

PALISADES ACQUISITION XV, LLC

210
Sylvan
Avenue
Englewo
od Cliffs,
New
Jersey
07068

Lowenste
in
Sandler
PC

65
Livingsto
n Avenue
Roseland
, New
Jersey
07068
Attention
: Daniel
J. Barkin,
Esq.

The parties hereto may at any time change the name and addresses of persons to whom must be sent all notices or other documents required to be given under this Agreement by giving written notice to the other party.

12.4

12.5   Binding Nature of Agreement . This Agreement is and shall be binding upon and inure to the benefit of the parties hereto, and their respective legal representatives, successors and permitted assigns.

12.6   Assignment . Neither party may assign this Agreement or any of its rights in this Agreement without the other's prior written consent, except as provided in Article 9 above. Notwithstanding the foregoing sentence, Sellers may assign its rights and obligations under this Agreement to any of its affiliates, subsidiaries, or parent corporations without obtaining Buyer's permission or consent.

12.7   Expenses . Except as otherwise expressly provided in this Agreement, Buyer and the Sellers will each bear its own out-of-pocket expenses in connection with the transaction contemplated by this Agreement.

12.8   Entire Agreement . This Agreement and the Exhibits hereto embody the entire agreement and understanding between the parties with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter. The parties make no representations or warranties to each other, except as contained in this Agreement or in the accompanying Exhibit or the certificates or other closing documents delivered in accordance with this Agreement. All prior representations and statements made by any party or its representatives, whether orally or in writing, are deemed to have been merged into this Agreement, except as otherwise stated in this Agreement.

12.9   Amendment . Neither this Agreement nor any of its provisions may be changed, waived, discharged or terminated orally. Any change, waiver, discharge or termination may be effected only by a writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

18     Severability . If any one or more of the provisions of this Agreement, for any reason, is held to be invalid, illegal or unenforceability, the invalidity, illegality or unenforceability

will not affect any other provision of this Agreement, and this Agreement will be construed without the invalid, illegal or unenforceable provision.

12.10  Waiver . Except as required under Section 3.4, no failure of any party to take any action or assert any right hereunder shall be deemed a waiver of such right in the event of the continuation or repetition of the circumstances giving rise to such right.

12.11  Headings and Sections . Headings are for reference only, and will not affect the interpretation or meaning of any provision of this Agreement. All references to Section numbers herein shall refer to Sections of this Agreement.

12.12  Counterparts . This Agreement may be signed in one or more counterparts, all of which taken together will be deemed one original.

12.13  Joint and Several Liability . SELLERS SHALL BE JOINTLY AND SEVERALLY LIABLE FOR ALL OF ANY OBLIGATIONS OF ANY SELLER(S) UNDER THIS AGREEMENT.

13.    TERMINATION AND DEFAULT

13.1.  Termination. If Sellers are in default hereunder for a material breach of one or more of the material terms or conditions of this Agreement and such failure continues for more than ten (10) business days after receipt of written notice, Buyer may, provided that it is not itself in material breach of one or more of the material terms of this Agreement, (i) terminate this Agreement by written notice delivered to Sellers, in which event Buyer shall be entitled to full return of the Deposit, or (ii) waive such defaults and proceed to Closing. If Buyer defaults hereunder, and such default is not cured within ten (10) days after written notice thereof from Sellers, then Sellers shall may terminate this Agreement and retain the Deposit as damages; however, Buyer acknowledges that Sellers' actual damages resulting from such breach would be uncertain and not readily ascertainable and agrees that the amount of the Deposit is a reasonable estimate of the lower end of such damages and that nothing in this Section 13.1 shall prevent the Sellers from seeking damages in excess of the Deposit. In the event of a termination of this Agreement as provided in Section 13.1, this Agreement will be of no further force or effect and there will be no liability on the part of any party

with respect thereto, except that the provisions of Sections 10, 11, 12 and 13 will survive any such termination and nothing herein shall relieve any party from liability for any breach of this Agreement occurring prior to such termination.

19

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized officers as of the date first written above. BUYER: **PALISADES** ACQUISITION XV, LLC

By:

|s| Mitchell Cohen (Signature) Mitchell Cohen Manager

Name:

Title:

SELLERS: GREAT SENECA FINANCIAL CORPORATION,

PLATINUM FINANCIAL SERVICES

CORPORATION, MONARCH CAPITAL

CORPORATION, COLONIAL CREDIT

CORPORATION, CENTURION CAPITAL

CORPORATION, SAGE FINANCIAL

CORPORATION and HAWKER FINANCIAL

CORPORATION

By:

|s| Daniel J. Vamer (Signature) Daniel J. Vamer President

Name:

Title:

20

ACCESSION NUMBER: 0000950123-07-001702

LANGUAGE: ENGLISH

LOAD-DATE: February 9, 2007

# **APPENDIX C**

1819152

*1/08*
*#35*

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## MUNICIPAL DEPARTMENT, FIRST DISTRICT, COOK COUNTY

Hawker Financial Corp.

               Plaintiff,

vs                                     Case No. 06M1 196515

TARA F OWENS

               Defendant.

### MOTION

Now comes the Plaintiff, Hawker Financial Corp., by its attorneys Blatt, Hasenmiller, Leibsker and Moore, LLC and moves this court to correct the misnomer.

WHEREFORE, Plaintiff requests leave to amend the Plaintiff's name from Hawker Financial Corp. to Palisades Acquisition XVI, LLC.

### ORDER

This cause coming to be heard on Plaintiff's Motion to Correct the Misnomer, the court being duly advised in the premises;

It is hereby ordered that the Complaint is amended on its face and instanter to amend Plaintiff's name from Hawker Financial Corp. to Palisades Acquisition XVI, LLC.

_____

Date

_____

Judge

*Judge Margaret A. Brennan*
*AUG 3 0 2007*
*Circuit Court-1846*

Blatt, Hasenmiller, Leibsker & Moore, LLC
125 South Wacker Drive, Suite 400
Chicago, Illinois 60606
(312) 704-9440

PLTMHAWI

# APPENDIX D

TRIAL CALL ORDER                                          CCG- 1108

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## MUNICIPAL DEPARTMENT, FIRST DISTRICT, COOK COUNTY

LINE NO. 16

PALISADES ACQUISITION XVI, LLC
                              Plaintiff                    NO. 06M1 196515

                    vs.

TARA F OWENS

                         Defendant

### TRIAL CALL ORDER

Present before the court: [___] Plaintiff [___] Defendant [ X ] Plaintiff's Counsel [___] Defendant's Counsel
     This matter having come before the court, the court having jurisdiction and being fully advised,
**IT IS HEREBY ORDERED:**

| | | |
|---|---|---|
| [___] | (4213) | Alias Summons to Issue for _____ |
| [___] | (4292) | File Amended Complaint _____ |
| [___] | (4295) | Take And Complete Discovery By _____ |
| [___] | (4234) | File Counterclaim _____ |
| [___] | (4234) | File Appearance / Jury Demand (Strike jury demand if not allowed) _____ |
| [___] | (4234) | Answer or Otherwise Plead Within _____ days. |

[___]  (4219,  Defendant _____ is defaulted, cause set for
        4247)        prove-up on _____ at _____

[___]  (4482)  Set For Status _____ at 9:30 a.m. Room _____
[___]  (4482)  Set For Trial _____ at 9:30 a.m. Room _____
[___]  (8005)  Case Dismissed For Want of Prosecution
[ X ]  (8011)  Case Dismissed By Agreement of Parties / No Costs [___] With or [ X ] Without Prejudice
[___]  (4219,  X-Parte Default Judgment for Plaintiff for $_____ v.
        8001,  _____
        4293)       with costs.
[___]  8001,  Judgment is entered by agreement for $_____ v.

        9207)       being further agreed that installment payments be made as follows: Plaintiff
                    to pay defendants costs of 1450.00
[___]  ( )    within 30 days.

[___]  ( )
[___]  (9208)  The Court finds no just reason for delay in enforcement or appeal of this judgment
[___]  ( )    See Attached Order.

Attorney No. 01237A                                        _____ 20___
Blatt, Hasenmiller, Leibsker & Moore LLC
Attorney for Plaintiff                    ENTER:   *Judge Margaret A. Brennan*
125 S Wacker Drive, Suite 400                                 NOV 01 2007
Chicago, Illinois 60606-4440              _____
(312) 704-9440                            Judge        Judge's No. Circuit Court - 1848
Ref # 1819152

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

PLTOCJMI