# APPENDIX E

2008 NY Slip Op 50033U, *; 2008 N.Y. Misc. LEXIS 44, **

2 of 2 DOCUMENTS

[*1] Deutsche Bank National Trust Company, As Trustee of Argent Mortgage Securities, Inc. Asset-Backed Pass Through Certificates, Series 2005-W4 Under the Pooling and Servicing Agreement Dated as of November 1, 2005, Without Recourse, Plaintiff, against Gustavo Castellanos, Argent Mortgage, LLC, and New York State Department of Taxation and Finance, Defendants.

277/07

SUPREME COURT OF NEW YORK, KINGS COUNTY

*2008 NY Slip Op 50033U*; *2008 N.Y. Misc. LEXIS 44*

January 14, 2008, Decided

NOTICE:  THIS OPINION IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE PRINTED OFFICIAL REPORTS.

COUNSEL: [**1] For Plaintiff: Richard F. Komosinski, Esq., Knuckles & Komosinski, PC, Tarrytown, NY.

For Defendant: No Opposition submitted by defendants to plaintiffs' Judgment of Foreclosure and Sale.

JUDGES: Hon. Arthur M. Schack , J.S.C.

OPINION BY: Arthur M. Schack

OPINION

Arthur M. Schack, J.

Plaintiff's renewed application for a judgment of foreclosure and sale for the premises located at 78 Van Siclen Avenue, Brooklyn, New York (Block 3932, Lot 45, County of Kings) is denied without prejudice. In my prior decision in this case, issued on May 11, 2007, *15 Misc 3d 1134 (A), 841 N.Y.S.2d 819, 2007 NY Slip Op 50978(U)*, I enumerated various defects in plaintiff's (Deutsche [*2] Bank) application. This renewed application does not address any of these defects. Further, my review of the instant application raises two additional matters that must be satisfactorily addressed or I will dismiss the instant action with prejudice.

As noted in my May 11, 2007 decision, Deutsche Bank lacks standing to bring this action since January 19, 2007, the day when Deutsche Bank assigned the instant mortgage and note to MTGLQ Investors, L.P. Goldman Sachs calls MTGLQ Investors, L.P. a "significant subsidiary" in exhibit 21.1 of its November 25, 2006 10-k Filing with the Securities and Exchange [**2] Commission. I explained (*citing Saratoga County Chamber of Commerce, Inc. v Pataki, 100 NY2d 801,* 812, 798 N.E.2d 1047, 766 N.Y.S.2d 654 [2003], cert denied 540 U.S. 1017, 124 S. Ct. 570, 157 L. Ed. 2d 430 [2003], Caprer v Nussbaum, 36 AD3d 176, 181, 825 N.Y.S.2d 55 [2d Dept 2006], and Stark v Goldberg, 297 AD2d 203, 746 N.Y.S.2d 280 [1st Dept 2002]) how Deutsche Bank now lacks standing to pursue this action. Further, I held, *at 2007 NY Slip Op 50978(U) \*5-6*:

It is clear that plaintiff Deutsche Bank lacks standing to sue since January 19, 2007, when it assigned its ownership of the Castellanos' mortgage loan to the Goldman Sachs subsidiary, MTGLQ Investors, L.P. The Court, in *Campaign v Barba, 23 AD3d 327, 805 N.Y.S.2d 86*, instructed that "[t]o establish a prima facie case in an action to foreclose a mortgage, the plaintiff must establish the existence of the mortgage and the mortgage note, *ownership of the mortgage*, and the defendant's default in payment [*Emphasis added*]." (*See Household Finance Realty Corp. of New York v Winn, 19 AD3d 545, 796 N.Y.S.2d 533 [2d Dept 2005]; Sears Mortgage Corp. v Yaghobi, 19 AD3d 402, 796 N.Y.S.2d 392 [2d Dept 2005]; Ocwen Federal Bank FSB v Miller, 18 AD3d 527, 794 N.Y.S.2d 650 [2d Dept 2005]; U.S. Bank Trust Nat. Ass'n Trustee v Butti, 16 AD3d 4 08, 792 N.Y.S.2d 505 [2d Dept 2005]; First Union Mortgage Corp. v Fern, 298 AD2d 490, 749 N.Y.S.2d 42 [2d Dept 2002] ; Village Bank v Wild Oaks Holding, Inc., 196 AD2d 812, 601 N.Y.S.2d 940 [2d Dept 1993]*). [**3] However, in light of the fact that Deutsche Bank has established the existence of the mortgage and the note, and defendant's default in payment, the Court is denying

Case 1:07-cv-06397    Document 32-2    Filed 02/13/2008    Page 3 of 50

Page 2

2008 NY Slip Op 50033U, *; 2008 N.Y. Misc. LEXIS 44, **

the judgment of foreclosure and sale without prejudice. If Deutsche Bank moves to substitute assignee MTGLQ Investors L.P. as plaintiff, pursuant to *CPLR § 1021* and no other material facts change, the Court will grant the substitution of plaintiff to MTGLQ Investors L.P., which will allow the proper mortgagee, the one with standing, to receive a judgment of foreclosure and sale. (*East Coast Properties v Galang, 308 AD2d 431, 765 N.Y.S.2d 46 [2d Dept 2003]; Lincoln Savings Bank, FSB v Wynn, 7 AD3d 760, 776 N.Y.S.2d 908 [2d Dept 2004]; CPLR* [*3] *§ 1018; GOL § 13-101).*

Plaintiff Deutsche Bank has failed to move to substitute MTGLQ Investors, L.P. as plaintiff.

Two additional matters plaintiff needs to address in a renewed motion

In my recent review of the moving papers in the renewed motion, I noticed that the July 21, 2006-"affidavit of merit" was executed by Jeff Rivas, who claims to be Deutsche Bank's Vice President Default Timeline Management. On the same day, Mr. Rivas executed, before the same notary public, M. Reveles, a mortgage assignment from Argent Mortgage [**4] Company, LLC, claiming to be Argent's Vice President Default Timeline Management. Did Mr. Rivas somehow change employers on July 21, 2006 or he is concurrently a Vice President of both assignor Argent Mortgage Company, LLC and assignee Deutsche Bank? If he is a Vice President of both the assignor and the assignee, this would create a conflict of interest and render the July 21, 2006-assignment void.

Also, Mr. Rivas claims that Argent Mortgage Company, LLC is located at 1100 Town and Country Road, Suite 200, Orange, California, while Deutsche Bank has its offices at One City Boulevard West, Orange, California. Did Mr. Rivas execute the assignment at 100 Town and Country Road, Suite 200, and then travel to One City Boulevard West, with the same notary public, M. Reveles, in tow? The Court is concerned that there may be fraud on the part of Deutsche Bank, Argent Mortgage Company, LLC, and/or MTGLQ Investors, L.P., or at least malfeasance. If plaintiff renews its motion for a judgment of foreclosure and sale, the Court requires a satisfactory explanation by Mr. Rivas of his recent employment history.

In my May 11, 2007 decision, in discussing the January 19, 2007 assignment from Deutsche [**5] Bank to MTGLQ Investors, L.P., I observed, *at 2007 NY Slip Op 50978(U) *5,* that:

the January 19, 2007 assignment has the same address for both the assignor Deutsche Bank and the assignee MTGLQ Investors, L.P., at 1661 Worthington Road, Suite 100, West Palm Beach, Florida 33409. The Court will not speculate about why two major financial behemoths, Deutsche Bank and Goldman Sachs share space in a West Palm Beach, Florida office suite. What is clear to this Court is that Deutsche Bank assigned the mortgage during the pendency of this application, but neglected to move to amend the caption to reflect the assignment or discontinue the foreclosure action. The Court . . . has no choice but to deny the application for a judgment of foreclosure [*4] and sale without prejudice. Plaintiff Deutsche Bank lacks standing to proceed with this action since January 19, 2007.

However, my subsequent decision, *HSBC Bank, N.A. v Cherry, 18 Misc 3d 1102 (A), 2007 N.Y. Misc. LEXIS 8279, 2007 NY Slip Op 52378(U)*, issued on December 17, 2007, observed that Scott Anderson, on June 13, 2007, as Vice President of Mortgage Electronic Registration Systems, Inc. (MERS) assigned a mortgage and note to HSBC Bank, N.A., as Trustee for various collateralized debt obligations. Mr. Anderson's assignment [**6] lists 1661 Worthington Road, Suite 100, West Palm Beach, Florida 33409 (Suite 100), as MERS address. The assignment also lists Suite 100 as the address for HSBC. Further, Mr. Anderson, two days later, on June 15, 2007, executes an "affidavit of merit" as "Senior Vice President of Residential Servicing for Ocwen Federal Bank, FSB, servicing agent of HSBC Bank, N.A."

I noted, *at 2007 NY Slip Op 52378(U) *3,* that:

with HSBC, OCWEN and MERS, joining with Deutsche Bank and Goldman Sachs at Suite 100, the Court is now concerned as to why so many financial goliaths are in the same space. The Court ponders if Suite 100 is the size of Madison Square Garden to house all of these financial behemoths or if there is a more nefarious reason for this corporate togetherness.

Therefore, if Deutsche Banks seeks to renew its motion for a judgment of foreclosure and sale, it must provide an

2008 NY Slip Op 50033U, *; 2008 N.Y. Misc. LEXIS 44, **

affidavit explaining why Suite 100 is such a popular venue for all of these corporations. Should Deutsche Bank fail to provide an adequate explanation in its affidavit, I will conclude that this corporate togetherness is evidence of corporate collusion.

Conclusion

Accordingly, it is

ORDERED, that the motion of plaintiff, DEUTSCHE BANK NATIONAL TRUST [**7] COMPANY, AS TRUSTEE OF ARGENT MORTGAGE SECURITIES, INC. ASSET-BACKED PASS THROUGH CERTIFICATES, SERIES 2005-W4 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF NOVEMBER 1, 2005, WITHOUT RECOURSE, for a judgment of foreclosure and sale for the premises located at 78 Van Siclen Avenue, Brooklyn, New York (Block 3932, Lot 45, County of Kings), is denied without prejudice; and it is further

ORDERED, that leave is granted to plaintiff, DEUTSCHE BANK NATIONAL TRUST COMPANY,

AS TRUSTEE OF ARGENT MORTGAGE SECURITIES, INC. ASSET-BACKED PASS THROUGH CERTIFICATES, SERIES 2005-W4 UNDER THE POOLING AND SERVICING AGREEMENT DATED AS OF NOVEMBER 1, 2005, [*5] WITHOUT RECOURSE, to renew its motion for a judgment of foreclosure and sale for the premises located at 78 Van Siclen Avenue, Brooklyn, New York (Block 3932, Lot 45, County of Kings), only if it presents to the Court within thirty (30) days from the date of this decision and order: an affidavit from Jeff Rivas describing his employment history for the past three years; and, an affidavit explaining why it shares office space at Suite 100, 1661 Worthington Road, West Palm Beach, Florida 33409 with Goldman Sachs, HSBC Bank, N.A., Ocwen Federal [**8] Bank FSB, and Mortgage Electronic Registration Systems, Inc.

This constitutes the Decision and Order of the Court.

Hon. Arthur M. Schack

J. S. C.

# APPENDIX F

Case 1:07-cv-06397    Document 32-2    Filed 02/13/2008    Page 6 of 50

Page 1

2006 N.Y. Misc. LEXIS 4036, *; 235 N.Y.L.J. 71

1 of 1 DOCUMENT

**Palisades Collection LLC v. Haque**

**64374/05**

CIVIL COURT OF THE CITY OF NEW YORK, QUEENS COUNTY

*2006 N.Y. Misc. LEXIS 4036; 235 N.Y.L.J. 71*

April 13, 2006

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiff corporation sued defendant individual, seeking damages for breach of contract and an account stated. The court held a bench trial.

OVERVIEW: Although it was well settled that the absence of an underlying agreement, if established, did not relieve a defendant of an obligation to pay for goods and services received on credit, the corporation faced an additional impediment in pursuing its breach of contract claim as it failed to provide any admissible evidence that its alleged assignor and the individual had entered into a contract pursuant to which the individual was obligated to pay for the additional charges for which the corporation had sued. The corporation had not proven by a preponderance of the evidence that the individual's account was in fact assigned to the corporation. Similarly, the corporation, as an alleged assignor, failed to establish the requisite elements for recovery on a theory of account stated as there was no evidence that the individual had assented, expressly or impliedly, that he was indebted to the corporation or the alleged assignor in the sum claimed, and that he had undertaken, by express or implied promise, to pay that sum. Thus, the complaint was to be dismissed.

OUTCOME: The individual was awarded a judgment dismissing the complaint.

JUDGES: [*1] Judge Pineda-Kirwan

OPINION BY: Pineda-Kirwan

OPINION

On January 10th and 19th, 2006, a non-jury trial was held in this action alleging damages for breach of contract and an account stated. After trial, the Court reserved decision. The Court relies on its own notes for this decision.

According to the complaint verified by plaintiff's attorney, plaintiff, alleged to be a New Jersey corporation, brings this action as the owner of "AT&T WIRELESS, Acct # 00250000039050943." The first cause of action alleges that plaintiff and defendant entered into a goods and services contract pursuant to which defendant agreed to pay plaintiff all amounts charged to said account. The complaint alleges that "upon information and belief" the agreement containing the terms and conditions governing the use of the charge account, was mailed to defendant, and, further, "upon information and belief" defendant incurred charges of $ 4,075.40 by the use of the account.

In its second cause of action, for an account stated, plaintiff alleges that it "and/or AT&T WIRELESS" mailed monthly statements to defendant, and, defendant received and retained those statements without objection.

Damages in the amount of $ 6,144.49 [*2] are claimed, an amount that represents the balance on the account and interest from November 10, 1999.

Pro se defendant's answer states only that defendant would like to see a judge and that he needs a lawyer. Defendant testified at trial through the assistance of a Bengali interpreter. At trial, defendant's motion for leave to amend his answer to add a general denial was granted.

Findings of Fact

Plaintiff's witness, Joanne Bergman testified that she is employed by plaintiff as its vice-president of legal affairs and is the custodian of plaintiff's books and records. Ms. Bergman further testified that plaintiff is a wholly owned subsidiary of Aster Funding, Inc. On the second day of testimony, the witness stated that she was "affiliated" with plaintiff. While it was not clear from the witness' testimony whether she is employed by plaintiff or by Aster Funding, Inc., defendant did not object to her testimony. Ms. Bergman testified that plaintiff is in the business of purchasing original debts from creditors. According to the witness' testimony, and in contradiction to the allegations in the complaint, AT&T Wireless, not

2006 N.Y. Misc. LEXIS 4036, *; 235 N.Y.L.J. 71

plaintiff, and defendant entered into a contract for cellular [*3] telephone service.

Ms. Bergman testified that plaintiff is authorized to perform any and all acts relating to certain accounts assigned to plaintiff by AT&T Wireless pursuant to a limited power of attorney and a bill of sale and assignment of benefits. These two documents, both dated July 2004, were admitted into evidence as plaintiff's Exhibit 1A and 1B. These documents, however, name, as the assignee, an entity which is a Delaware limited liability company, not a New Jersey Corporation, as this plaintiff alleges itself to be. Nor do the documents contain an indication that consideration was paid for the assignment and neither document is executed by plaintiff as the assignee. Further the assignment refers to a "Purchase and Sale Agreement" and indicates that an "Account Schedule" is attached to that agreement. Plaintiff did not seek to introduce the "Purchase and Sale Agreement" with its annexed schedule into evidence.

In contrast to the wording of the assignment which references the "Purchase and Sale Agreement" and its annexed schedule of accounts, the witness testified that the purchased accounts came to plaintiff by electronic transmission. Ms. Bergman testified credibly that [*4] the electronic statements were received on December 13, 2005. Ms. Bergman testified that defendant's account was included in those purchased by plaintiff. Plaintiff then sought to introduce into evidence a document, dated January 9, 2006, that the witness testified was the hard copy of the account summary generated by AT&T Wireless and electronically sent to plaintiff pertaining to this defendant. The witness testified that plaintiff did not have copies of any statements from AT&T Wireless that were allegedly sent to defendant.

Defendant Mohammad Haque objected stating that the document was not plaintiff's document but was created from other sources including his bill which he showed to plaintiff at an earlier court conference.

Plaintiff then sought to admit spreadsheets as proof of the transaction between plaintiff and AT&T Wireless, and again defendant objected.

Inasmuch as the "mere filing of papers received from other entities, even if they are retained in the regular course of business," is insufficient to lay a foundation for the business records exception to hearsay rule, the objections were sustained and the documents were not admitted. (See *CPLR 4518 [a]*; [*5] *Kane v. Triborough Bridge & Tunnel Auth, 8 A.D.3d 239, 778 N.Y.S.2d 52 [2d Dept 2004]*; *Standard Textile Company v. National Equipment Rental, 80 A.D.2d 911, 437 N.Y.S.2d 398 [2d Dept 1981]* .) Ms. Ber gman testified that she was not familiar with AT&T's billing practices and data entry. Thus, she could not lay a proper foundation for the admission of these documents. (Cf *People v. Cratsley, 86*

*N.Y.2d 81, 653 N.E.2d 1162, 629 N.Y.S.2d 992 [1995].*)

Plaintiff attempted to introduce into evidence a document entitled "Terms and Conditions" which does not name defendant, contains no specific terms as to this defendant's particular account, and contains no signatures, claiming that AT&T Wireless sent it to defendant with the information regarding defendant's account. Ms. Bergman testified that plaintiff received it from AT&T Wireless along with the electronic transmission. In light of the earlier testimony that the account came to plaintiff via electronic transmission, it was not clear from the testimony how the "Terms and Conditions" document was sent along with the other information.

Defendant examined the document and objected on the grounds that the document was not his contract with AT&T Wireless as it did not [*6] contain the terms of his agreement and that he had never receive d such a document from AT&T Wireless. As plaintiff could not demonstrate that AT&T Wireless ever sent defendant this document, as the document was introduced to prove the truth of its contents, and as plaintiff failed to lay an adequate foundation for its admission as a business record, the objection was sustained. (*CPLR 4518 [a]*; *Kane v. Triborough Bridge & Tunnel Auth, 8 A.D.3d 239, 778 N.Y.S.2d 52, supra.*)

Plaintiff again sought to introduce the "Terms and Conditions" document by claiming that AT&T Wireless sent the document to plaintiff as part of the purchase of defendant's account. Defendant again objected on the basis that it was not his contract, and the objection was again sustained. Plaintiff essayed several more times to introduce the "Terms and Conditions" contract, defendant objected, and each time the objection was sustained. Thus, plaintiff was unable to offer evidence of the terms of the agreement between AT&T Wireless and defendant.

Plaintiff's witness then testified about the acc ount purchased from AT&T Wireless regarding this defendant, stating his name, address, cellular telephone [*7] number and the balance on his account which the witness testified was $ 4,152.95.

After this witness concluded her testimony, plaintiff, pursuant to *CPLR 4401*, moved for a judgment on its breach of contract and account stated causes of action. The motion was denied. Plaintiff then called defendant as a witness.

Defendant testified that he had an account with AT&T Wireless that he obtained through a P.C. Richards store in the summer of 1998. When asked about the terms of the account, defendant testified credibly that he paid $ 24.99 per month plus tax for the service and the terms further provided that he had free evenings after 9:00 PM and free weekends airtime. Mr. Haque stated that he

Case 1:07-cv-06397   Document 32-2   Filed 02/13/2008   Page 8 of 50

Page 3

2006 N.Y. Misc. LEXIS 4036, *; 235 N.Y.L.J. 71

received monthly bills from AT&T for the agreed upon amount and he regularly paid that amount.

Having been served with a subpoena for his AT&T Wireless bills, defendant produced a bill and plaintiff introduced the bill as Exhibit 4. The bill is dated August 20, 1999 and reflects a balance in the amount of $ 3,520.43. Defendant testified credibly that this was the only bill he still had from AT&T Wireless.

When asked if he paid the balance on the account, defendant testified [*8]  that he paid $ 24.99 plus tax each month for twelve months. He further testified that, when he received the bill in July 1999, in the amount of $ 1,326.54, which, for the first time ever, charged him for nighttime and weekend service, he, together with the assistance of a friend who spoke better English, telephoned AT&T Wireless from his home, to complain about the bill. The defendant testified credibly that he was told that his twelve month contract had run out but that if he wanted it reinstated retroactively, with the same terms as before, he had only to pay $ 56.00. The witness testified that he paid that amount as directed and that he continued to use the telephone.

It is noted that Exhibit # 4 reflects that the monthly charge is $ 24.99 and indicates that an amount of $ 56.00 having been paid. It further reflects that of the many calls itemized calls listed, the vast majority were made after 9:00 PM. It is not evident from the bill which days were weekends.

Defendant was then asked if he sent a writing to contest the amount owed on the August 20, 1999 bill, and the defendant testified credibly that he did not, but that he called AT&T Wireless to complain and was told that he [*9]  conversations were being recorded. Mr. Haque testified that for most of those phone calls he would stand next to a friend who interpreted for him.

Plaintiff rested and defendant then testified on direct. Defendant stated that in June or July 1998, he and a friend were shopping in P.C. Richards store in order to purchase a video cassette recorder. The witness stated that they were approached by a salesman about purchasing a phone and contracting with AT&T Wireless at the rate of $ 24.99 per month with free weekend and evening cellular service and that they both did so. The witness testified credibly that he paid for the phone with his American Express card and that he then paid the $ 24.99 per month with tax for an approximate total of $ 31.00 each month for the next year. Mr. Haque testified that he made his calls after 9:00 PM and on weekends to use the free service. The witness testified that he did not receive a "Terms and Conditions" contract when he purchased the phone and service at P.C. Richards and that no such document was ever sent to him.

The Court credits the witness' testimony that in July 1999, when he saw the bill for more than $ 1,300, he called AT&T Wireless to complain [*10]  and that from that conversation he understood that he could reinstate the prior terms retroactively and erase the balance by paying $ 56.00. Mr. Haque was credible when he stated that when a second bill was sent dated August 20, 1999 which did not correct the previous bill, and contained new charges of more than $ 2,000, he again called to complain. When the third bill came without reducing the amount, defendant testified that he called and cancelled his service. The witness' testimony that he made his calls after 9:00 PM and on weekends was supported by the bill dated August 20, 1999.

Defendant testified that on earlier court dates, plaintiff's attorney asked him for copies of his bill which he provided. Defendant testified that he had asked plaintiff for copies of earlier bills but plaintiff did not so provide. Defendant stated that the only contract he ever had with AT&T Wireless was to pay $ 24.99 per month plus tax with weekends and evenings after 9:00 PM free.

As above stated, defendant's motion to amend his answer to add a general denial was granted. Notwithstanding the lack of any allegation regarding an assignment in the complaint, plaintiff did not move to conform the pleadings [*11]  to the evidence. (CPLR 3025 [c].)

Conclusions of Law

It is well settled that to create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms. (See *Martin Delicatessen v. Schumacher, 52 N.Y.2d 105, 417 N.E.2d 541, 436 N.Y.S.2d 247 [1981]*). This requirement allows a Court to effectively enforce the parties' mutually agreed terms and conditions when one party seeks to uphold them against the other. (See *Express Indus & Terminal Corp. v. NYS DOT, 93 N.Y.2d 584, 715 N.E.2d 1050, 693 N.Y.S.2d 857 [1999]*.)

While it is well settled that the absence of an underlying agreement, if established, does not relieve a defendant of his obligation to pay for goods and services received on credit, (*Citibank (SD) NA v. Roberts, 304 A.D.2d 901, 757 N.Y.S.2d 365 [3rd Dept 2003]*,) that is not the sole impediment to this plaintiff's case. Here, without any admissible evidence from its alleged assignor, plaintiff was unable to establish that AT&T Wireless and defendant entered into a contract pursuant to which defendant was obligated to pay for the additional charges for which defendant now sues.

Further, in [*12]  light of the dearth of evidence presented at trial regarding the assignment and the infirmities therein, plaintiff did not prove by a preponderance of the evidence that defendant's account was in fact assigned to plaintiff. (See *Copelco Capital, Inc v. Packaging Plus Services, Inc, 243 A.D.2d 534, 663*

*N.Y.S.2d 104 [2d Dept. 1997]; Citibank (SD), NA v. Martin, 11 Misc. 3d 219, 807 N.Y.S.2d 284, 2005 NY Slip Op 25536 [Civ Ct NY County].*) Had plaintiff been able to prove that much, as it is undisputed that defendant did not pay the monthly charge of $ 24.99 for August and September, plaintiff would have been entitled to a judgment for those amounts.

Similarly, plaintiff, as an alleged assignor, failed to establish the requisite elements for recovery on a theory of account stated. (*Heelan Realty & Dev Corp v. Ocskasy, 27 A.D.3d 620, 812 N.Y.S.2d 124, 2006 NY Slip Op 2166 [2d Dept 2006].*) There was no evidence before the Court that defendant assented, expressly or impliedly, that he was indebted to plaintiff, or, for that matter, AT&T Wireless, in the sum claimed, and undertook, by express or implied promise, to pay it. (*Tridee Assoc., Inc. v. Bd. of Educ. of City of New York, 22 A.D.3d 833, 803 N.Y.S.2d 706 [2d Dept 2005].*)

Holding of [*13] the Court

Accordingly, the Court awards defendant a judgment dismissing the complaint.

# APPENDIX G

Copyright 2007 The Baltimore Sun Company
All Rights Reserved
The Baltimore Sun

**May** 6, 2007 Sunday
FINAL EDITION

**SECTION:** BUSINESS; Personal Finance; Pg. 1C

**LENGTH:** 1610 words

**HEADLINE:** ZOMBIE DEBT;
DEBT CAN COME BACK TO HAUNT YOU YEARS LATER

**BYLINE:** Eileen AMbrose, Sun Columnist

**BODY:**

Carole Kelley got a letter out of the blue last year saying she owed nearly $1,200 on an unpaid credit-card bill.

But Kelley says she never had plastic from the card issuer listed. No such debt had appeared on her credit report when she bought a house three years earlier. Her credit monitoring service had never turned up the debt. And the letter didn't use her current married name.

"So I called, and they told me I owed it. I said, `I don't understand this. What is this from? I can't even tell exactly where it began,'" says Kelley, a paralegal with a Westminster law firm.

When she pressed for answers, the situation turned ugly. The debt collector insisted the debt was on her credit report and that she owed it. "I got off the phone very angry, just frustrated," she says. "They treat you like a piece of dirt."

Kelley now suspects she is being haunted by zombie debt.

Zombie debt is just that - an old debt that won't die off. It may be passed from one debt buyer to another, for years, until one day consumers are startled to find a collector demanding payment.

It may be debt that the consumer owes and has forgotten - or hoped the creditor forgot. But it can also be old bills that have been paid, discharged in bankruptcy, racked up by an identity thief or belonging to someone who shares the same name. Many times, the details from the debt collector are so sketchy that consumers have no idea whether they owe the money or not.

"Usually, the sign of a zombie debt is you can't figure out what it is. It's very old. It's often from someone whom you never had a contract with so the names won't be familiar," says Towson consumer lawyer Jane Santoni. "You haven't heard anything for years and years and years. ... And then all of a sudden, it's back again. Well, where did it come from?"

Consumer and bankruptcy lawyers say zombie debt cases have grown along with the debt purchasing industry.

Debt purchasers have been around for a long time, but the savings and loan bailout in the mid-1980s took the industry to a new level.

The government sold off huge portfolios of delinquent credit-card debt to finance the bailout, spawning some of today's leading debt buyers, according to Bethesda-based Kaulkin Ginsberg, an adviser to debt buyers.

Now credit card issuers routinely package their uncollectibles and sell them to debt buyers for pennies on the dollar. Buyers take their turn at trying to collect and later might bundle uncollected debt to sell to another buyer. Debts may be sold again and again.

Credit-card bills remain the bulk of debt sold. But hospitals, retailers, gyms, utilities, cell phone service companies and student loan lenders are selling off their unpaid bills.

In 2005, debt buyers purchased $110 billion of consumer debt and the revenue from those old bills exceeded $3 billion, says Paul Legrady, director of Kaulkin Ginsberg.

It's a big business and growing, fueled by Americans' insatiable appetite for credit.

"We're a country that loves our debt, and whenever it is extended, there is a risk of default. And when that takes place, the sale of debt is a viable option for credit issuers," Legrady says.

This means more people will be visited by old debt that refuses to die.

`Once a week'

Sonya Smith-Valentine, a consumer lawyer in Greenbelt, says a few years ago clients would call once every four or five months to complain about zombie debt. "Right now, it's probably at least once a week," she says.

Bankruptcy lawyers say they increasingly see the resurrection of debt that was discharged by the court.

Baltimore bankruptcy lawyer Robert Grossbart says one of his clients had her debts wiped out in a 1988 bankruptcy, yet different debt collectors in the past few years have dogged her to pay those old bills.

Grossbart says sometimes people, like his client, find out about revived debts when a collector starts calling or sending letters. Or, they might discover it on their credit report when they're trying to get a loan or refinance a mortgage.

"It's sold so many times that the new buyer doesn't do any due diligence ... to verify whether this debt has been discharged or not," he says.

Brad Botes, a bankruptcy lawyer in Birmingham, Ala., says he tells clients to check their credit reports a few months after debts have been discharged. More than half the time, clients find discharged debts incorrectly reported, he says.

"Just like any other business, mistakes happen and they are typically corrected," says Dennis Hammond, president of The Debt Marketplace, a consultant to creditors and debt buyers.

But Hammond adds that credit-card issuers write off billions of dollars in unpaid bills each year and those losses are passed on to all consumers.

"Why is it the creditor or collector's fault that you haven't paid the bill or you think you shouldn't have to pay it?" he says. "Debt collectors aren't bad guys. They perform a service to every consumer in the marketplace to help keep prices down."

Debt collectors are No. 1 on the Federal Trade Commission's complaint list, accounting for nearly one out of five consumer gripes. Consumers have rights under the federal **Fair Debt Collection** Practices Act. For instance, they have 30 days after receiving a collection letter to dispute the debt and demand verification. At that point, the collector must stop collection efforts until it produces proof.

Some disputes aren't settled by a letter and end up in court.

Each state gives collectors a certain amount of time to file a lawsuit to recover unpaid bills. Once the statute of limitations expires, collectors can't pursue the consumer in court. That doesn't mean consumers no longer owe the money or that collectors can't attempt to collect it in other ways.

In Maryland, the statute of limitations generally is three years since the last payment on credit-card debt. Some debts, though, can be pursued in court for up to 12 years.

Beatrice Christian of Baltimore is battling three debt buyers in court now.

The 81-year-old says she paid off credit-card bills with a home equity loan in 1999 and at that time closed all but one charge account. But she started hearing from bill collectors and getting court summonses last year after refinancing her mortgage.

"If I felt that I owed it, I would make arrangements to pay," says the retired Social Security clerk. "I honestly don't feel as if I owe it."

Christian wonders if debt buyers are confusing her with another woman with the same name. She says her credit report shows a birth date that would make her about half her age.

"Part of the problem with these bills is we don't know exactly what they are for," says Santoni, Christian's lawyer. "It may be that it's a bill from the other person. It may be it's a bill that she's paid. It may be a bill that we don't know about. But they have not to date let us know why they claim these bills are owed."

Christian scored one court victory.

Worldwide Asset Purchasing sued a year ago to collect $8,875, but the judge dismissed the case last fall, according to court documents. Christian counter-sued, and early this year the judge awarded her $7,500 plus $5,300 in legal fees. Worldwide is appealing, and its lawyer declined to comment.

So what can consumers do when zombie debt haunts them?

First, don't ignore it.

The problem won't go away and could end up in court. If you ignore a court summons, the judge could rule against you, possibly leading to your wages being garnished or a lien placed on your property, lawyers say.

If you recognize the debt as yours, make arrangements to repay it, says consumer lawyer Smith-Valentine.

Fighting back

If you're not sure or know it's not yours, then use the tools under the **Fair Debt Collection Practices Act** to fight back.

"It's actually powerful, if they use it to their advantage," says Smith-Valentine.

You have 30 days after receiving a letter - the way debt collectors usually will contact you - to challenge the debt in writing and ask for verification that the debt belongs to you. Send the letter by certified mail with return receipt to make sure the collector got it, Smith-Valentine says.

In some cases, a consumer's first notice of the debt collection is a court summons. Even then, it's not too late to ask for debt verification and stop the collection activity until proof is provided, says Rozanne Andersen, general counsel for ACA International, a trade group for debt buyers and collectors.

Of course, the collector might come back with the evidence to jog your memory about a bill you owe. If there's doubt that it's your debt, resist the temptation to pay some money to get rid of a persistent collector, until you get verification.

"The burden of proof is on the collector to show that the debt is owed," Santoni says. "What people often do in these cases, they go ahead and pay something because they are panicked."

Problem is, making a payment may be seen as acknowledging the debt, she says.

If it was your old debt and the statute of limitations had expired, making a payment will start the clock again. It also can lead to the debt reappearing on your credit report, lawyers say. Delinquent debts generally remain on a report for seven years.

Working in a law office, Kelley was aware she had rights. "I know I don't owe it," she says. After she spoke with the debt collector last fall, she wrote a letter disputing the debt. "I haven't heard from them again," she says.

The debt collector says due to privacy laws it cannot comment on Kelley's case.

Kelley has advice to fellow consumers: "Read the mail, even if you think it's junk. ... You never know what's disclosed in there."

To suggest a topic, contact Eileen Ambrose at 410-332-6984 or by email at eileen.ambrose@baltsun.com

**GRAPHIC:** Photo(s)
2. Beatrice Christian, 81, of Baltimore has been fighting debt collectors in court over zombie debt for the past year. She says she paid off credit-card bills with a home equity loan in 1999.
1. Photo Illustration by Brian Henderson; Original Images by Istockphoto 2. Barbara Haddock Taylor : Sun photographer

**LOAD-DATE:** May 7, 2007

# APPENDIX H



**DEBT WEIGHT**

The Consumer Credit
Crisis in New York City
and its Impact on the
Working Poor

URBAN
JUSTICE

October 2007

# DEBT WEIGHT

## The Consumer Credit Crisis in New York City and its Impact on the Working Poor

Community Development Project
The Urban Justice Center

www.urbanjustice.org/cdp

October 2007

## ABOUT THE COMMUNITY DEVELOPMENT PROJECT

The Community Development Project (CDP) of the Urban Justice Center was created in September 2001 to provide legal, technical, research and policy assistance to grassroots community groups engaged in a wide range of community development efforts throughout New York City. Our work is informed by the belief that real and lasting change in low-income, urban neighborhoods is often rooted in the empowerment of grassroots community institutions. Since 2005, CDP's services have included representing alleged debtors on credit card, cell phone and medical debt cases in New York City Civil Court. In addition, CDP represents victims of consumer fraud and unfair debt collection practices in affirmative litigation in state and federal court. CDP also offers general counsel services to community groups advocating for economic justice, including consumer justice.

## ACKNOWLEDGMENTS

This report was authored by Anika Singh. The New York City Civil Court Clerk's Office provided us easy access to the case files we reviewed to assemble this report. In particular, Carol Alt was an invaluable resource. Clerks in the five county courthouses, including Eddy Valdez, Lorraine Kenny, Joseph Traynor, Mike Boyle, Kaye Fong, Peter Catella, and their staff, were immensely helpful. Ted DeBarbieri, Chaandi McGruder, Molly Moynihan, Rachel Castelino and John Whitlow provided assistance reviewing case files. Dina Mishra provided research assistance. April Herms and Laine Romero-Alston made it possible for us to review and analyze the data. David Galt produced the maps. Thank you to Indie Singh and April Herms for proofreading the report. The law firm of Skadden, Arps, Slate, Meagher & Flom, LLP helped to make printing this report possible. This report would not have been possible without all of their hard work and that of Ray Brescia and Harvey Epstein, both of whom supervised this project.

# CONTENTS

EXECUTIVE SUMMARY     **1**

BACKGROUND: CONSUMER DEBT AS A RISING CHALLENGE FOR WORKING NEW YORKERS     **3**

PART I: INTRODUCTION TO DEBT     **3**

    Casting Judgment: The Explosion in Debt Collection Litigation and its Impact on New Yorkers     **3**

    Debt and the Working Poor     **5**

    Sub-Prime Lending     **6**

    Regulating Debt Collectors     **7**

    Debt Collection Litigation in New York City Civil Court     **8**

PART II: OUR STUDY     **9**

    Findings     **9**

    Who are the Defendants?     **11**

    Total Value of Claims Sought in Debt Collection Litigation     **13**

    Plaintiffs Initiating Debt Collection Litigation     **13**

    Representation     **16**

    Resolution     **17**

    The Value of Default Judgments     **21**

PART III: CONCLUSIONS AND POLICY RECOMMENDATIONS     **21**

APPENDICES     **24**

    Appendix A: Study Methodology     **24**

    Appendix B: City Council Districts in Which Defendants Reside     **25**

ENDNOTES     **27**

# EXECUTIVE SUMMARY

The number of consumer debt cases filed in New York City Civil Court has exploded in recent years. In 2006 alone, approximately 320,000 such cases were filed in the five boroughs; this number is comparable to the total number of civil and criminal cases filed in the federal trial courts nationwide that year. Almost $1 billion in claims were made against New York City residents in consumer debt filings in 2006; in that year, we estimate that creditors ultimately obtained judgments of almost $800 million. In many ways, New York City Civil Court has become the "credit card court", with a majority of the cases filed throughout the five boroughs classified as consumer debt cases.

The impact of this judgment debt is profound. Once a judgment is obtained by a creditor against a debtor, the situation goes from bad to tragic. A creditor with a judgment can garnish wages and freeze bank accounts. Often, due to additional penalties, interest, fees and costs, the ultimate judgment obtained far exceeds any original debt that might have accrued. Sometimes, the defendant never owed the alleged debt, which may have been the result of identify theft, mistaken identity, clerical errors, or illegal fees and charges.

Once an account is frozen, a debtor under such a crushing weight may be unable to pay rent bills, utilities, obtain medicine and pay for food and other necessities. A judgment will invariably show up on credit reports and such a black mark on a credit report will make it more difficult to find an apartment, get a better job, and obtain credit. For the working poor, the judgment blocks their climb up the economic ladder, and they cannot obtain better housing or a better job, or get a loan for a car or home.

The total amount of judgments obtained against city residents in 2006, approximately $800 million, is the equivalent of building one new stadium for the Mets *every year*. Against this backdrop, this report is an attempt to understand the manner in which creditors are using the Civil Court of the City of New York to collect debts. To this end, the Urban Justice Center reviewed 600 randomly selected cases, all filed in February of 2006, in the five borough courthouses of the Civil Part of New York City Civil Court. The results of our research are striking.

## Key Findings

*Defendants rarely appear to defend themselves against consumer credit litigation.* In 93.3% of cases, the defendant neither filed an answer nor entered into a settlement agreement. Anecdotal evidence suggests that this is the result of plaintiffs' failure to serve the summons and complaint on defendants so that defendants have no notice of the lawsuits against them. Other possibilities include defendants' inability to appear in court during normal business hours, defendants' inability to locate affordable legal representation, and defendants' own neglect.

*Defendants are virtually never represented by counsel. We estimate that between zero and four percent of defendants are represented by counsel.* Given that all creditors are represented by counsel and the defenses available to debtors can be complex, the gross disparity in representation means the overwhelming majority of legitimate defenses to the claims available to the debtors are never raised.

*80.0% of cases result in default judgments, which are routinely granted without the requisite proof to establish the damages sought.* When applying for a default judgment, a plaintiff is required to submit proof of the facts supporting its claim. In the cases we reviewed, the materials submitted in support of applications for default judgments almost always constitute inadmissible hearsay and do not meet the standard set forth in section 3215(f) of the Civil Practice Law and Rules. Nevertheless, in our study, applications for default

judgment were approved 100% of the time. In other words, plaintiffs are able to obtain judgments against defendants without ever submitting any proof that the defendants owe a debt to anyone or evidence of the amount of the alleged debt. The court system is being used to endorse hundreds of thousands of default judgments, which then wreak havoc on the lives of hundreds of thousands of New Yorkers.

*We found that the monetary impact of consumer credit litigation in New York City is massive and approached an estimated one billion dollars in 2006.*

*The vast majority of litigation, 89.3% of all cases, is brought by debt buyers who have purchased defaulted debt from the company that originally issued the consumer credit, the original creditor.* In other words, New Yorkers are sued by companies with which they have had no prior relationship. In addition, the majority of litigation is based on alleged debts with a small number of original creditors, many of which are common issuers of sub-prime credit cards. Furthermore, despite state and local laws that require entities seeking to collect debts through the courts to be licensed by state and city agencies, many creditors have not obtained such licenses. Just twelve of the thirty-nine debt buyers that filed lawsuits reviewed in this study were licensed by New York City's Department of Consumer Affairs.

## Recommendations

- Because the vast majority of debtors are unrepresented, more funding is needed for free legal services for debtors.

- Funding should be provided to offer more pro se resources, particularly assistance from court-employed or volunteer attorneys, in the court houses.

- The standards for obtaining default judgments must be clarified by the New York City Civil Court.

- The New York City Council should clarify the licensing requirements governing debt purchasers to ensure that only licensed debt collection agencies can avail themselves of the city courts. The New York City Department of Consumer Affairs should take a more proactive role in ensuring that the court system is not abused.

- Further research is needed to determine the reasons most debtors do not defend themselves in civil court actions brought against them.

- New York State should enact the Exempt Income Protection Act to protect the subsistence income of judgment debtors.

- Compensate defendants for fees and costs incurred in defending themselves against frivolous cases.

# BACKGROUND: CONSUMER DEBT AS A RISING CHALLENGE FOR WORKING NEW YORKERS

Staff members at the Urban Justice Center (UJC), a provider of free legal services to low-income and working poor New Yorkers, have noticed a steep rise in the number of New Yorkers seeking representation in consumer debt matters in the Civil Court of the City of New York. Anecdotal evidence suggests that this increase in demand for representation in consumer debt matters is a reflection of a larger city-wide phenomenon: that more working New Yorkers are facing lawsuits by credit card companies and other purveyors of consumer debt, at a time when the rising cost of living makes it more difficult for the working poor and the middle class to make ends meet. The UJC set out to explore this phenomenon by assessing the impact of consumer debt litigation on New York consumers. We also set out to examine, to the extent possible, the relative merits of a sample of civil filings, to determine the viability of the consumer credit claims raised in the Civil Court. Research into the nature of consumer debt litigation in New York City has led to the conclusions of this report, which include a finding that few defendants are represented by an attorney, that an overwhelming number of these cases are won by the creditor on default, and that a small number of creditors, typically third-party debt buyers, bring the majority of cases. Based on these findings, we make a number of recommendations, which are set forth at the end of this report. What follows, first, is an overview of the issue of consumer debt, on both local and national levels. Second, we review our findings. Finally, we set forth our policy recommendations outlining how New York City can respond to this growing crisis.

## PART I: INTRODUCTION TO DEBT

### Casting Judgment: The Explosion in Debt Collection Litigation and its Impact on New Yorkers

The volume of consumer debt litigation in New York City Civil Court has risen dramatically in recent years, with approximately 320,000 consumer debt cases filed in 2006 alone.[1] In fact, the number of consumer debt cases filed in the Civil Court now exceeds by 60% all Civil Court filings in 2001.[2] Indeed, between October 1, 2005 and September 30, 2006, there were 326,401 civil *and* criminal cases filed in all of the federal trial courts, the United States District Courts, combined nationwide.[3] Clearly, as the Civil Court itself recognizes, "[t]he Civil Court of the City of New York is one of the busiest Courts in the world."[4]

There are a number of complementary explanations for the massive increase in consumer credit transaction litigation over recent years. The nationwide volume of consumer debt has risen – more families are in debt and are in more debt than ever before.[5] Nationwide, the total value of consumer debt now exceeds $800 billion, a 31% increase in just the last five years.[6] Furthermore, more and more working families are using consumer credit to pay for basic necessities. Indeed, a recent survey of people with credit card debt revealed that "[s]even out of 10 low- and middle-income households reported using their credit cards as a safety net—relying on credit cards to pay for car repairs, basic living expenses, medical expenses or house repairs."[7]

But this shift in the economy and the manner in which consumers are making ends meet are only part of the explanation for the increase in consumer debt litigation. Through the 1970's, 80's and 90's, regulators and the courts largely gutted the regulatory scheme governing fees and interest charged by creditors.[8] As a result, credit card companies and businesses in similar industries charge ever-increasing interest rates and fees to consumers. Access to credit has increased as well.[9] Furthermore, identity theft, the fastest-growing crime in the country, results in debts which are never paid and are wrongfully ascribed to innocent victims.[10] Lastly, there is a growing market for purchase of defaulted debts.[11] These assignees, also known as third-party debt buyers, having purchased large volumes of debt for pennies on the dollar, then aggressively seek to collect on the full value of defaulted debts plus interest and fees. All of these factors contribute to New York's increase in consumer credit litigation.

More important than the mere increase in the number of Civil Court filings are the outcomes of so many of these cases, and how these outcomes impact average New Yorkers. As this study demonstrates, 80.0% of the cases we reviewed resulted in default judgments against unrepresented defendants. Once a judgment is entered, its effects can be devastating to the average New Yorker. A judgment creditor can enforce the judgment, without any further judicial intervention, and garnish the defendant's wages or restrain his or her bank account for twice the amount of the judgment.[12] Among the cases reviewed in our study, the average default judgment amount is $3,063.83. A judgment creditor can then freeze twice the judgment amount, or, on average, $6,127.65. The effect of this restraint, which can last up to a year, can be devastating. Clearly, for a family living paycheck-to-paycheck, a restraint on over $6,000 freezes the family's entire savings, assuming they had any to begin with. For New Yorkers with the lowest incomes, who may survive on Social Security or disability benefits, pensions, public assistance, child support, or Veterans benefits, their income is exempt from collection and restraint by creditors. Nevertheless, New York law currently allows savings from these sources of income to be restrained by a creditor with a judgment. The burden is then on the judgment debtor to prove that federal and state law exempt such income from collection. Even assuming the judgment debtor is aware of his or her rights to claim the exempt income, the claim process can take months. In the interim, the money remains restrained.

As a result of garnishments and frozen accounts, families are prevented from paying the rent, purchasing necessities like food and medication, and paying for utilities. The effect of a restraint or garnishment is particularly shocking where a person had no prior notice that he or she was the subject of a lawsuit.

Even where a person had notice of the lawsuit, he or she may not have had any knowledge that the lawsuit could result in a judgment and restraint that would far exceed what the person reasonably believed was owed the creditor, given that the judgment typically includes sums that represent the creditor's claims for penalties, interest, attorney fees and other fees and that restraint is twice the judgment amount. And he or she may be faced with the difficult choice of missing a day's wages and appearing in court in an effort to defend oneself, without an attorney, against a corporation represented by counsel.

For example, Ms. DM, a client of the Urban Justice Center and a single mother with a full-time job, earns $1,600 per month. As a result of identity theft, an $800 judgment of which she had had no notice was entered against her in July of 2006. Using the judgment, the judgment creditor restrained Ms. DM's bank account. Ms. DM was completely unaware that she had been sued until her bank account was restrained. The restraint lasted six weeks, causing Ms. DM to be late on a number of legitimate bills, including her rent, credit cards, life insurance premiums, and phone bills. Her bank assessed "legal processing fees" for having restrained the account. Unable to resolve the matter on her own, Ms. DM retained the services of the Urban Justice Center and, eventually, a court ordered the account released and dismissed the lawsuit against her. Nevertheless, as a result of the late payments, Ms. DM incurred hundreds of dollars in fees and interest charges. She also lost wages for days spent in court and meeting with her attorney.

In addition to leading to frozen accounts, high fees, and difficulty purchasing food and necessities, judgments also appear on credit reports. They remain on credit reports for up to seven years and have a significant negative impact on credit scores. Credit reports are frequently used to evaluate applications for loans and credit cards. They are also increasingly used by potential employers, landlords (even affordable housing developments intended for poor and working poor tenants), banks, insurance companies, and automobile financers.[13] In other words, a blemish on a credit report can have a snowball effect that makes it difficult for an individual to save money, find affordable housing, or obtain employment. The result is that a single consumer credit judgment can severely impair a person's attempt to become self-sufficient. As one commentator has noted, the "pervasiveness of destabilizing, high-cost credit in New York's low income neighborhoods is reflected back in people's credit reports, further perpetuating poverty for millions of New Yorkers."[14]

For example, Mr. ES, also a client of the Urban Justice Center, obtained a copy of his credit report only to find that the first item listed was a judgment. Prior to seeing his credit report, Mr. ES had not known that he had even been sued. Mr. ES was applying for jobs and had been unable to obtain employment. Many of the employers to whom Mr. ES applied required access to his credit report and considered his report in determining whether to extend him an offer of employment. When Mr. ES learned of the judgment on his credit report, he was able to find free legal representation. As a result of that representation, the judgment was vacated and the creditor agreed to discontinue the action.

In another example, in January 2006, Mr. OC was told that his wages would be garnished. Mr. OC had never received notice that he had been sued. According to the plaintiff's filings, the process server claimed to have served a non-existent person on a date when Mr. OC's entire family was out of the country, in the Dominican Republic. As a result of his blemished credit, Mr. OC, who was in the process of starting his own business, had trouble raising the necessary capital for his venture. Once represented by the Urban Justice Center, Mr. OC entered into a mutually acceptable settlement and payment plan with the creditor.

The vast majority of default judgments are not vacated, as this study demonstrates, and the judgment debtor must incur the costs and hardship of that judgment. The impact of consumer credit judgments on New Yorkers is immense and growing. The time is ripe to consider the forces underlying these judgments and the impact of consumer credit litigation on New York City. This study is just the first step of what should be a comprehensive review of the use of New York City Civil Court as the primary forum for the resolution of these cases.

## Debt and the Working Poor

One out of five New Yorkers and a third of New York's children live in poverty[15] – this despite the fact that in over 46% of poor households, the head of the household is working.[16] 19% of New Yorkers live below the poverty line and an equal number have incomes that measure 100%-199% of poverty.[17] These are the working poor.

The working poor increasingly attempt to bridge the gap between their incomes and their needs with consumer debt. Nationally, consumer debt has increased rapidly over the past decade or so, particularly among low-income families. For example, the share of families with high credit card payments (above 10 percent of income) nearly doubled, rising from 13.5% in 1989 to 23.0% in 2004.[18] In 2004, roughly one out of every three families in the bottom income quintile carried credit card debt.[19] The mean amount of credit card debt was $6,504 for households with incomes less than $35,000 per year.[20] 36% of those who owe more than $10,000 on their credit cards have household incomes under $50,000.[21] On average, low-income families owe roughly 10 percent of their income on credit cards alone.[22] And in 2004, 27% of families in the bottom income quintile faced a debt-to-income ratio of 40% or greater.[23] Since 2005, the consumer savings rate in the United States has been below zero percent.[24]

The working poor fall into debt from hospitalization, trade school tuition (and, in some cases, fraud), student loans, or even prior emergency public benefit assistance. The Center for Responsible Lending has found that "the underlying reason behind some households having higher levels of credit card debt than other households was the occurrence of unforeseen events, such as job loss, medical expenses or car breakdowns."[25] As health costs increase, and since health insurance is no longer a standard employee benefit, medical emergencies will affect household expenses and debts more significantly than in the past.[26]

As a result of meager incomes, the high price of basic necessities, and the often astronomical costs associated with credit, many of New York City's working poor simply cannot pay their debts. We estimate that nearly 400,000 of the city's poorest households spend at least 40% of their monthly income paying their credit card and installment bills. Given that the average New York City family must devote nearly half its monthly income to rent,[27] the gravity of the situation is clear. The Federal Reserve reports that the number of the poorest families that have debts more than sixty days past due has increased by 50% over the past decade.[28]

A University of Michigan study found that more than half of low-income families with high consumer debts and low net worth in 1994 were still mired in debt in 1999, with their average indebtedness growing from $2,900 to $18,500.[29]

## Sub-Prime Lending

A subset of the financial services market caters to individuals with spotty credit histories, low incomes, or limited access to the mainstream financial market. Against the backdrop of recent volatility in the housing market and a surge in foreclosure rates, sub-prime mortgages have become a prime area of focus for the media, advocates, and policymakers. New York City is a city of renters, however, where only one-third of New Yorkers own their homes (compared to two-thirds nationwide) and, relative to the rest of the country, a disproportionate number of homeowners have high incomes.[30] While New Yorkers have certainly fallen prey to the sub-prime market's abuses, costly and often predatory practices are not limited to the sub-prime mortgage industry. Sub-prime credit cards, like sub-prime home mortgages, are characterized by their high fees and interest rates. Sub-prime issuers make money by issuing credit cards with low credit limits, high interest rates, and high fees, including annual fees, over-limit fees, user fees, and delivery fees, many of which accrue before the consumer ever uses the card. A new cardholder might easily and immediately exceed a credit limit without making any charges, simply by accruing fees and interest on those fees.[31]

This type of debt can have a debilitating impact on the working poor, who may not be able to pay down balances, and, as a result, might face exorbitant and ever-mounting fees piled upon fees. Once debt accumulates, borrowers face higher interest payments and fees to service their debt. For the working poor, living from paycheck to paycheck, credit card interest and fees can rapidly far exceed the amounts borrowed. A bounced or late check can result in fees that further run up balances, resulting in underpayment of the next month's bill, often before the borrower realizes that there is a problem. As a result, the unexpected fees and interest accumulate and lead to negative credit history and bankruptcy.

The sub-prime sector, once dominated by a few discrete banks, like Providian Financial, became the fastest-growing segment of the credit card industry in the late 1990's.[32] By 2003, regulators and others began to crack down on sub-prime credit card issuers and a number of banks closed their sub-prime operations as a result of high rates of default and bankruptcy among their customers.[33] The New York State Attorney General's office has pursued two enforcement actions against sub-prime credit card issuers: Cross Country Bank, which was ordered to pay $9 million in penalties and refunds in January of 2006, and Columbus Bank and Trust Company and CompuCredit Corporation, which, in July 2006, agreed to reform their business practices and pay $11 million in restitution to New York consumers.[34] Six of the six hundred files reviewed in this study involved debts accrued with one of these three lenders and, as described below, we estimate that 30.0% of the cases reviewed involved sub-prime credit card debt. If we exclude cell phone debt from the study, we estimate that 46.6% of all the non-cell phone cases involved sub-prime credit card debt.

Nevertheless, sub-prime credit issuers continue to court and issue cards to low-income and other consumers.[35] Furthermore, the predatory surcharges and interest fees that plague the sub-prime credit card industry are also prevalent in the mainstream credit card industry.[36] Many of the major credit card issuers charge penalty fees for late payments (averaging $34 per late payment in 2005) or for exceeding one's credit limit (averaging $31 per occurrence in 2005).[37] Some charge higher "default" interest rates as a penalty for exhibiting riskier behavior, and often apply this higher rate retroactively to *all* outstanding balances.[38] In addition, credit card issuers use other tricks to maximize their revenues at low-income card holders' expense; twenty-three of the twenty-eight most popular large-issuer cards allocate payments to lowest interest balances first, and some cards use a double-cycle billing method that eliminates the interest-free period for certain unwitting customers.[39] These tricks catch many low-income and other credit card holders by surprise, especially since credit card agreements are often written at an eleventh- or twelfth-grade reading level while nearly half of the adult population in the United States reads at or below the eighth-grade level.[40]

## Regulating Debt Collectors

Debt collectors are regulated on the federal level by the Fair Debt Collection Practices Act (hereinafter "FDCPA"),[41] on the state level by Article 29-H of the General Business Law,[42] and on the city level by the Administrative Code of the City of New York.[43]

The FDCPA prohibits a range of unfair debt collection practices by debt collection agencies. The statute applies with full force to purchasers of defaulted debt who then collect debt in their own name. In the majority of cases, it does not apply to original creditors. Courts have found that the FDCPA's general prohibition of unfair and abusive debt collection practices applies to unfair and misleading litigation practices as well as to other more familiar debt collection techniques, like phone calls and letters. The New York State debt collection statute prohibits certain unfair and abusive debt collection practices. It applies with equal force to both original creditors and debt collection agencies. It does not, however, include a private right of action and is enforced by the New York State Attorney General.

The New York City Administrative Code requires debt collection agencies to be licensed by the New York City Department of Consumer Affairs (hereinafter "DCA"). The licensing requirement was motivated by a finding by the City Council that there exist "consumer related problems with respect to the practices of debt collection agencies whose sole concern is the collection of debts owed to their clients."[44] Such debt collection agencies include third-party debt buyers and assignees.[45] The Council found that "there is a minority of unscrupulous collection agencies in operation that practice abusive tactics . . . which would shock the conscience of ordinary people."[46] "Due to . . . the vulnerable position consumers find themselves in when dealing with these agencies" the Council sought to protect "the interests, reputations and fiscal well-being of the citizens of this city . . . ."[47]

The term debt collection agency includes both companies that are contracted by creditors to perform debt collection services and third-party purchasers of defaulted debt. DCA has, however, issued confusing guidance regarding the need for certain third-party debt buyers to obtain a license where the debt buyer engages a law firm to initiate a lawsuit against the alleged defendant on behalf of the debt buyer. Debt buyers have interpreted this guidance to mean that certain debt buyers need not be licensed by DCA so long as their attorney is so licensed, despite the fact that it is the debt buyer that pursues litigation against alleged debtors. It is our firm belief that when requiring licensing of debt collectors, including purchasers of defaulted debt, the City Council did not intend to relieve a debt buyer of its obligation to obtain a license simply because it engaged a licensed debt collection law firm as its counsel.

Despite the regulatory scheme governing debt collectors, the working poor, like other New Yorkers, are often the victims of illicit debt collection practices. Between 2004 and 2006, the number of consumer complaints received by the City's Department of Consumer Affairs regarding debt collection practices jumped 70%.[48] The complaints range from attempts to collect invalid debts, to home and workplace harassment, improperly damaged credit histories, and more.[49] When their efforts to collect a debt by making phone calls and sending letters fail, debt buyers and creditors take their collection efforts and abusive practices to court.

Our study reveals that in 99.0% of applicable cases reviewed, debt buyers submitted facially invalid evidence in support of applications for default judgments.[50] As a result, it is impossible to tell how many of the 320,000 debt collection lawsuits filed annually have merit. We can only speculate as to the extent to which debt buyers are using the courts as an avenue to engage in unscrupulous, and unlawful, debt collection practices. Nevertheless, the debt buyers' consistent failure to provide relevant evidence in support of their claims suggests that they do not possess such evidence. Furthermore, anecdotal evidence suggests that where defendants appear and, using the discovery process, demand that plaintiffs produce evidence of their claims, plaintiffs often voluntarily discontinue an action. In essence, debt buyers initiate litigation on the presumption that they will prevail as a result of the defendant's default. Given the incredibly high default rate, such an

assessment is, far more often than not, correct. Where the defendant appears and the plaintiff is forced to prove its case, it often chooses not to and instead discontinues the action. If it is assumed that plaintiffs could not, if forced to do so, substantiate their claims in just 50% of the cases where a plaintiff failed to proffer admissible evidence in support of an application for a default judgment, it would call into serious question the underlying legitimacy of a significant percentage of all consumer credit cases filed in the Civil Court.

## Debt Collection Litigation in New York City Civil Court

As described earlier, the volume of debt collection litigation in New York City Civil Court has risen dramatically over recent years.[51] In New York City Civil Court, non-landlord/tenant civil filings have increased 300% in five years, in large part as a result of consumer credit litigation.[52] According to a ten-year report on New York City Civil Court, "general civil filings exploded over the past five years [2001 to 2006]. Most of the filings involve consumer credit transactions . . . ."[53] Given this explosion, it is an appropriate time to consider these cases more closely and to evaluate the impact that they are having on the court system, creditors, accused debtors and New York City's neighborhoods.

In 2006, 523,186 cases were filed in the Bronx, Kings, Queens and Richmond County courthouses of the Civil Part of New York City Civil Court. Of these, 277,075 cases, or 53% of the total, arose out of consumer credit transactions.[54] In the Bronx, consumer credit cases represented 65% of total civil filings, a substantially larger percentage than the city-wide average.

These numbers represent just four of New York's five counties. Because New York County maintains its records in a different format than do the other counties, it is omitted from these statistics. It is estimated that if New York County is taken into account, there were approximately 320,000 consumer credit transaction cases filed in New York City Civil Court in 2006. More and more, New York City Civil Court is becoming a "credit card court," with over 50% of cases filed in that court arising out of "consumer credit transactions."



CHART 1: Consumer Credit Transaction Filings as a Percentage of Total Filings

SOURCE: New York City Civil Court

# PART II: OUR STUDY

This study involved a survey of six hundred randomly-selected consumer debt cases filed in February of 2006 in order to increase our understanding of how consumer debt litigation takes place in New York and how it affects New Yorkers.[55] Specifically, we hope to better understand the following: How many New Yorkers were affected by debt collection litigation? Who are the plaintiffs and defendants in these cases? What types of debt are at issue? How often were alleged debtors represented by counsel? How many cases are settled? What is the average judgment amount? How are cases typically resolved?

Our research found that shockingly few defendants – just 6.7% – in consumer debt cases ever appear in court. Further research is required to determine whether this failure to appear results from fear of the court system, plaintiffs' failure to notify defendants that they have been sued (known colloquially as "sewer service"), or the inability to obtain the resources to defend oneself in court. Of those defendants who appeared in the cases reviewed, just two were represented by counsel. The rest represented themselves without the aid of an attorney.

Unfortunately, as a result of this shocking lack of representation and the utter failure or inability of the overwhelming number of defendants to appear to defend themselves, debt collectors and third-party debt buyers use the court system to obtain judgments against New Yorkers without ever having to concern themselves with proving their case in court. Our research further found that the debt collection litigation in New York City Civil Court has a massive monetary impact on New Yorkers. The estimated impact, almost $800 million,[56] is comparable to that of building a new major league baseball stadium in New York City *every year*.[57]

Abusive debt collection practices are not limited to the use of threatening letters and harassing phone calls. As courts have found, certain litigation techniques, like filing a lawsuit with no arguable merit or filing a suit after the applicable statute of limitations has passed, constitute abusive debt collection techniques.[58] These practices are particularly troubling where a defendant is unrepresented by counsel. In such cases, the vast majority of *pro se* litigants lack the requisite expertise and familiarity to defend themselves against these litigation methods. Alleged debtors, particularly those who are low-income, are rarely represented by counsel. New York's poor, as in so many other contexts, are forced to defend themselves from civil debt collection actions without the aid of an attorney.[59] This imbalance creates an obvious and unacceptable opportunity for harassment and abuse.

## Findings

(1) In 2006 alone, debt buyers and creditors filed almost $1 billion worth of lawsuits against New Yorkers and obtained judgments for almost $800 million, a staggering success rate.

(2) To a limited extent, consumer credit litigation is disproportionately concentrated in low-income neighborhoods in Brooklyn and the Bronx. On the whole, however, consumer credit litigation affects residents of all of New York's neighborhoods and city council districts.

(3) The vast majority of litigation is brought by debt buyers. In addition, the majority of litigation is based on alleged accounts with a small number of original creditors, many of whom are common issuers of sub-prime credit cards.

(4) Defendants rarely appear to defend themselves in consumer credit litigation, suggesting that many defendants are not properly notified that there is a lawsuit against them.

(5) 80.0% of cases result in default judgments. These are judgments based on the defendant's failure to appear to defend himself, not based on the merits of the plaintiff's case.

(6) In 99.0% of the cases where default judgments were entered, the materials underlying those applications constituted inadmissible hearsay and did not meet the standard set forth in section



**Defendants' Residences by City Council District**

City Council Districts

Defendants

SOURCE: Urban Justice Center calculations from review of New York City Civil Court case filings

3215(f) of the Civil Practice Law and Rules for the entry of a default judgment. Nevertheless, these applications were approved; the default judgments were entered; and New York consumers suffered the consequences.

## Who are the Defendants?

Of the 2006 consumer credit filings in the four counties other than New York, 41% were filed in Kings County, 27% were filed in Queens, 28% were filed in the Bronx and 4% were filed in Richmond County.[60] Based on the total number of cases filed in New York County during February of 2006 and the number of consumer credit cases filed in the four other counties during February of 2006, we estimate that if New York County is taken into consideration, 4% of cases are filed in Richmond County; 25% of cases are filed in the Bronx; 36% are filed in Brooklyn; 24% are filed in Queens; and 11% are filed in New York County. Appendix B includes a table indicating the City Council districts in which defendants in cases reviewed for this study reside. Map 1 displays this information as well. Map 2 shows where defendants reside relative to a neighborhood's average median income. As Map 2 indicates, there is a somewhat greater concentration in areas with lower median incomes, in particular, central Brooklyn and the South Bronx. Nevertheless, Map 1 and Appendix B demonstrate that this phenomenon is a city-wide problem. Defendants reside all over the city and in virtually every Council district. Note that these numbers are out of a sample of 600 cases. Given that plaintiffs filed approximately 320,000 consumer credit transaction cases in New York City Civil Court in 2006, we estimate that in twenty-four city council districts, as indicated in Appendix B, 5,000 or more residents faced consumer credit litigation last year. In an additional eight districts, over 10,000 residents faced consumer credit litigation. These are 12th, 14th and 16th Districts in the Bronx, and the 34th, 35th 36th, 41st and 42nd Districts in Brooklyn.



**CHART 2: Consumer Credit Transaction Filings as Percentage of City Total – February 2006**

SOURCE: New York City Civil Court and 2005 Census Bureau estimates from the Current Estimates Program

As Chart 2 shows, with respect to their population, both Kings County and Bronx County are overrepresented in terms of the number of consumer credit transaction filings. It is likely no accident that these two counties also have the lowest per capita income in New York City. In 1999 the per capita incomes in the Bronx and Kings County were $27,550 and $30,610, respectively, versus $38,042 for Queens, $43,573 for



**Defendants' Residences by Community District**
**Median Income Estimate**

- 15,544 - 30,000
- 30,000 - 40,000
- 40,000 - 50,000
- 50,000 - 60,000
- 60,000 - 76,010
- ⊚  Defendants

SOURCE: Urban Justice Center calculations from review of New York City Civil Court case filings. Furman Center for Real Estate and Urban
Policy, State of New York City's Housing and Neighborhoods 2006, available at http://www.furmancenter.nyu.edu/SOC2006.htm

New York County, and $54,252 for Richmond County.

In 93.3% of the files we reviewed, the defendant neither filed an answer nor entered into a settlement agreement filed with the court. Of the forty defendants, 6.7%, who appeared, eight did so only after a default judgment was entered against them. All eight successfully asked the court to vacate the default judgment, usually upon showing that they had had no prior notice of the lawsuit. Just two defendants were represented by counsel.[61] Given how few defendants appear in court and the fact that just two of the six hundred files reviewed reflected an appearance by an attorney on behalf of a defendant, it is not apparent from this study how many defendants have defenses to plaintiffs' claims of alleged debt because an unrepresented defendant may not be aware of all of the defenses he or she might raise.

For example, it is unclear how many defendants are victims of identity theft. Anecdotal evidence, however, suggests that identity theft is a significant problem and often results in debt collection litigation against individuals who have no liability for the debt in question. Almost nine million people, or four percent of the United States population, were victims of identity theft in 2006, according to the Council of Better Business Bureaus.[62] In fact, a recent study found that New York State has the highest rate of identity fraud among the fifty states.[63] Furthermore, New York City has the highest incidence of identity fraud among metropolitan areas.[64] Further research is required to determine how often identity theft plays a role in debt collection cases resulting in litigation. According to attorneys who practice in this area, other common defenses include mistaken identity, that a debt has already been paid, a plaintiff's lack of standing, and the inflation of an alleged debt by fees and interest unauthorized by law.

## Total Value of Claims Sought in Debt Collection Litigation

The amount sought in each of the cases reviewed ranged from $400.87 to $24,999.00.[65] The mean amount sought among the files reviewed was $3,062.57. Conservatively estimating that purported creditors filed 320,000 consumer credit cases in New York City Civil Court in 2006, we estimate that these lawsuits demanded an estimated $980,022,870.90, almost one billion dollars, in damages, interest and attorney fees from alleged debtors in New York City Civil Court.

## Plaintiffs Initiating Debt Collection Litigation

In 89.3% of the cases we reviewed, debt collection litigation was initiated not by the original creditor but by a third-party debt buyer who had purchased the debt in question. Third-party debt buyers typically purchase debt for pennies on the dollar. In one recent sale, for example, Asta Funding, Palisades Collection, LLP's parent company, purchased a debt portfolio of approximately $6.9 billion for $300 million, or 4.35 cents on the dollar.[66] After purchasing the debt, the third party may attempt to collect the full amount of the alleged debt by contacting the debtor or by bringing a lawsuit as an assignee of the original creditor.

Just twelve of the thirty-nine debt buyer plaintiffs who initiated lawsuits reviewed in this study are licensed by the New York City Department of Consumer Affairs. The twenty-seven unlicensed debt buyers brought 257, or 42.8%, of the 600 lawsuits reviewed.



CHART 3: Percentage of Plaintiffs Who are Original Creditors and Assignees

Original Creditor 10.7%

Assignee 89.3%

SOURCE: Urban Justice Center calculations from review of New York City Civil Court case filings

Our research found that a small number of companies bring the majority of the assignee litigation in New York City Civil Court. Indeed, as the following chart shows, out of the files we reviewed, just *one* creditor brought over one-third and just *two* creditors brought over one-half of all six hundred cases reviewed. These findings reflect the overall debt purchase industry in which just ten companies purchased two-thirds of defaulted credit card debt in 2004.[67]

**TABLE 1**

| Assignee Plaintiff | Number of Lawsuits (of sample of 600) | Percentage of Total Sample |
|---|---|---|
| Palisades Collection, LLC | 234 | 39% |
| Wholly-owned subsidiaries of Encore Capital Group, Inc. | 72 | 12 |
| LR Credit 10, LLC | 44 | 7.3 |
| Erin Capital Management, LLC | 21 | 3.5 |
| Colorado Capital Investments, Inc. | 16 | 2.7 |
| NY Financial Services, LLC | 13 | 2.2 |
| RAB Performance Recoveries, LLC | 13 | 2.2 |
| Rushmore Recoveries-related entities | 13 | 2.2 |
| Metro Portfolios, Inc. | 11 | 1.8 |
| LVNV Funding LLC | 9 | 1.5 |

SOURCE: Urban Justice Center calculations from review of New York City Civil Court case filings

Defendants can expect to receive somewhat less information regarding the alleged underlying consumer credit transaction when they are sued by a third party rather than an original creditor. In the cases reviewed in this study, where the assignee brought the lawsuit, there was a 49.3% chance that the complaint

would not include an account number for the alleged original debt. On the whole, however, the vast majority of complaints, 98.1%, filed by third parties did identify the alleged original creditor.

The majority of debt buyer litigation reviewed in our study was based on alleged credit card accounts. There is one major exception. Notably, the most common plaintiff, Palisades Collection, LLC, claims to have purchased a large portfolio of defaulted debt from AT&T Wireless when that company merged with Cingular in 2004.[68] It is not surprising then that in the plurality of lawsuits, the alleged debt had been incurred with AT&T Wireless. In fact, among cases reviewed in this study, alleged AT&T Wireless accounts were the basis of 43.7% of consumer credit cases brought by a third-party debt buyer and 39.0% of all of the files reviewed.

Interestingly, in September 2006, five individuals who had been sued by Palisades Collection, LLC for alleged AT&T Wireless debts in New York City Civil Court sued Palisades and its law firm, Pressler and Pressler, LLP, in federal court for violations of the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*[69] In particular, the five alleged that Palisades sued them without having made any effort to determine whether it had any basis to do so. Furthermore, they alleged that Palisades' complaints were patently untrue and that any materials provided in support of the underlying cases against the defendants constituted inadmissible hearsay and could not be used to support the plaintiff's original claims. In other words, the five alleged that Palisades Collection, LLC and Pressler and Pressler initiated lawsuits against alleged debtors knowing that they could not, if required to do so, prove the elements of their claims.[70]



**CHART 4: Incidence of Original Creditors in Litigation**

SOURCE: Urban Justice Center calculations from review of New York City Civil Court case filings

Of the other original creditors found in our file review, a number, particularly Providian,[71] Associates,[72] Direct Merchant Bank,[73] First National Bank of Marin,[74] Cross Country Bank,[75] First North American National Bank[76] and Household,[77] are common issuers of sub-prime credit cards. In addition, other lenders, like Citibank and Chase, offer sub-prime products. It is impossible to know exactly which cases involved sub-prime credit cards without reviewing the underlying credit card agreement in each case.[78] Nevertheless, taking into account the number of cases we reviewed that involved credit card issuers specializing in the sub-prime market, we estimate that approximately 29.2% of the cases brought by third-party debt buyers involve sub-

prime credit card debt. If we exclude AT&T Wireless cell phone accounts, sub-prime credit cards are the basis for 48.9% – almost half – of assignee-initiated litigation among the cases we reviewed.

Of the 10.7% of lawsuits brought by original creditors, 59.0% were brought by either of two creditors, Capital One or Discover Bank. Notably, Capital One is a common issuer of sub-prime credit cards.[79] If we include these cases when estimating how many lawsuits arise out of sub-prime credit card transactions, we can estimate that 30.0% of all six hundred cases reviewed involved sub-prime credit cards and that 46.6% of all non-cell phone cases reviewed involved sub-prime credit cards.

**TABLE 2**

| Plaintiff (Original Creditor) | Number of Lawsuits (of sample of 600) |
| --- | --- |
| Capital One | 25 |
| Discover Bank | 11 |
| Federated Department Stores | 5 |
| Citibank, N.A. | 3 |
| Other | 17 |

SOURCE: Urban Justice Center calculations from review of New York City Civil Court case filings

The prevalence of sub-prime credit card issuers among both plaintiffs and original creditors in these cases suggests, first, that these sub-prime cards are frequently unaffordable to cardholders and, second, that a large number of defendants in these cases are low-income. While many New Yorkers are victims of predatory home mortgage lending,[80] in a city of renters it is likely that larger numbers have fallen prey to sub-prime credit card lending. Low-income homeowners across the country have accessed home equity to pay other bills.[81] The result, in part, has been the depletion of home equity and savings.[82] Because few low-income New Yorkers can tap home equity to pay for basic expenses when their savings fall short, they have fewer credit products from which to choose when borrowing to make ends meet. As discussed above, the sub-prime mortgage foreclosure crisis is mirrored in the arena of consumer debt litigation – we believe this may be particularly true in New York, where the vast majority of low-income people do not own their own home.

## Representation

While 100% of plaintiffs initiating consumer credit transaction cases reviewed in our study were represented by counsel, just two of six hundred, or less than one percent of defendants, were represented. A small number of law firms bring the vast majority of consumer credit litigation.

**TABLE 3**

| Debt Collection Law Firm | Number of Lawsuits (of sample of 600) |
|---|---|
| Pressler and Pressler, LLP | 197 |
| Cohen & Slamowitz, LLP | 106 |
| Mel S. Harris & Associates, LLP | 67 |
| Wolpoff & Abramson, LLP | 63 |
| Rubin & Rothman, LLC | 37 |
| Eltman, Eltman & Cooper, P.C. | 21 |
| Mullooly, Jeffrey, Rooney & Flynn, LLP | 19 |
| Forster & Garbus, Esqs. | 18 |
| Malen & Associates, P.C. | 14 |
| Sharinn & Lipshie, P.C. | 11 |

SOURCE: Urban Justice Center calculations from review of New York City Civil Court case filings

Defendants were represented by counsel in just two of the cases reviewed in the course of this study. In both of these two cases in which an attorney appeared for the defendant, the parties stipulated to discontinuance of the action with prejudice.[83] Based on our research to date, and taking into account the appropriate margin of error for our analysis, we are able to say with 95% confidence that between zero and 4% of defendants overall are represented by counsel. It is widely acknowledged that too many tenants are not represented by counsel in New York City Housing Court; it would appear that even fewer alleged debtors are represented by an attorney.[84]

## Resolution

In 81.8% of cases reviewed in our study, the court entered a default judgment against the defendant. A default judgment is a judgment based not on the merits of the case, but on the fact that a party has not responded to a complaint or pleading or has not appeared in court when required to do so. This failure to respond or appear is considered a default. While the judgment is based on one party's default, default judgments require some evidentiary showing in addition to the default. As described below, they should not be entered where the plaintiff has not put forward any evidence of its underlying claim and damages.

In nine of the 491 cases where a default judgment was entered against the defendant, the court later vacated the default judgment upon a request by the defendant. These requests were typically based on the defendant not having received notice of the lawsuit prior to entry of the default judgment. In one of these 491 cases, the plaintiff discontinued the action following entry of the default judgment. As a result, in just under 2% of cases, a default judgment was entered but later vacated. In total, 80.0% of cases resulted in a final default judgment. In other words, the vast majority of plaintiffs secured judgments because the defendant did not appear to answer the complaint or failed to appear at a court-ordered hearing or conference. The number of default judgments we found in the New York City Civil Court corresponds to that found in a 2006 investigation of consumer debt cases in small claims courts in Massachusetts, which estimated that about 80% of people sued on consumer debts in Massachusetts courts failed to appear.[85] According to anecdotal evidence, like the stories of UJC clients described above, the fact that the defendant does not appear in court often results from the plaintiff's failure to provide notice of the lawsuit to the defendant. In addition, many alleged debts are years old and the plaintiffs do not have current contact information for alleged debtors. As a result, defendants do not receive actual notice that there is a lawsuit pending against them.

A much smaller percentage of cases, 5.9%, were settled by both parties. Typically, settlement

agreements provided either for discontinuance of the action or for defendants to make installment payments of $25 to $100 until the defendant had paid approximately 90%, on average, of the amount demanded in the complaint. In one case, the defendant's failure to make payments according to the settlement agreement gave rise to a later default judgment. 3.2% of cases were ultimately unilaterally discontinued by the plaintiff[86] and 4.5% were filed but never served on the defendant. In others, the case appeared to be still pending. Not a single case went to trial or was otherwise adjudicated on the merits.



**CHART 5: Resolution of Consumer Credit Lawsuits**

Other 6%
Settled 6%
Discontinued 3%
Filed But Never Served 5%
Default Judgment for Plaintiff 80%

SOURCE: Urban Justice Center calculations from review of New York City Civil Court case filings

Section 3215 of the New York State Civil Practice Law and Rules governs the entry of default judgments.[87] Where the plaintiff's claim is for a sum certain, as is the case in most consumer credit litigation, a default judgment may be entered upon application to the clerk. The plaintiff need not make a motion before a judge.[88] When a defendant defaults, the plaintiff need not prove its case at trial. Nevertheless, it must present some requisite proof – "proof of the facts constituting the claim, the default and the amount due"[89] – to make a showing that it has a valid case and that the amount sought is proper. In other words, the simple fact that the defendant has not appeared is not enough to support a default judgment. The plaintiff must make some showing that it has a valid claim. The Civil Practice Law and Rules do "not contemplate that default judgments are to be rubber-stamped once jurisdiction and a failure to appear have been shown. Some proof of liability is also required to satisfy the court as to the *prima facie* validity of the uncontested cause of action."[90] As a result, in its application for a default judgment, the plaintiff must provide some proof of its claim.

A recent case described the obligation of a plaintiff to set forth the basis of its claim when making an application for a default judgment – as well as the obligation of the clerk to confirm that the plaintiff has met its burden – as follows:

> The defendant's default does not automatically create a mandatory ministerial
> duty by the clerk to enter a default judgment against that defendant since the
> plaintiff is required to demonstrate that he or she has a viable cause of action.
> Section 3215(f) of Civil Practice Law and Rules requires the plaintiff to establish,

> in instances where the damages sought are for a sum certain or for a sum which can by computation be made certain, the facts constituting the claim, the default and the amount due. The plaintiff can satisfy this requirement through an affidavit of a party, *who possesses personal knowledge of the facts*, or with a complaint that is properly verified by a party with personal knowledge.[91]

A plaintiff seeking judgment on an alleged credit card debt must provide some proof of its claims. One court, considering the proof required to support a motion for summary judgment where a defendant has defaulted, required "an affidavit sufficient to tender to the court the original agreement, as well as any revision thereto . . . The same affidavit typically advances copies of the credit card statements which serve to evidence a buyer's subsequent use of the credit card and acceptance of the original or revised terms of credit."[92] "The affidavit must demonstrate personal knowledge of essential facts or the judgment will be assailable, even if the defendant defaults."[93] Where the plaintiff seeks attorney fees, it must also provide evidence in support of its claim for such fees. "A request for legal fees requires presentation of (1) an agreement to pay such fees, tendered by an appropriate affidavit, and (2) an attorney's affirmation detailing the fee arrangement, the legal services provided and the relevant factors bearing upon the claim."[94] In other words, the plaintiff must provide written testimony, or an affidavit, from someone who is familiar with and can testify to the legitimacy of the plaintiff's claim. It is not sufficient that the plaintiff submit an affidavit; the affidavit must by made "by a person with knowledge of [the relevant] facts."[95] Documents evidencing the claim, such as a signed credit card agreement and credit card statements, may also constitute proof of a claim.

In 2000, the New York City Civil Court responded to recent case law regarding the standards for materials provided by a plaintiff in support of its application for a default judgment. The Court issued a directive that "[a] default judgment entered by the Clerk following CPLR § 3215 requires that there be an affidavit of facts *from a party to the action*."[96] This directive is consistent with recent case law regarding whose affidavit may support an application for a default judgment. What it does not address, however, is the knowledge the affiant must have of the claim in question. Unfortunately, it would appear from the results of our study that plaintiffs are following only the letter of the directive. Typically, a plaintiff submits the affidavit of an agent of the party to the action, but does not follow the case law that requires that the affiant have personal knowledge of the facts constituting the cause of action.[97] In other words, third-party debt buyers provide affidavits from people who cannot actually attest to the legitimacy of their claims. By indicating that a party's representative must support an application for default judgment, the New York City Civil Court has taken one step towards ensuring that default judgments are granted on the basis of proper applications. Nevertheless, as the following discussion demonstrates, more direction is clearly needed.



**CHART 6: Materials Provided in Support of Default Judgment Where Plaintiff is an Assignee**

Other 3%

Affidavit from employee of unidentified entity 12%

Affidavit from third pary creditor's employee 85%

SOURCE: Urban Justice Center calculations from review of New York City Civil Court case filings

Of the cases reviewed, in the majority of those brought by a third-party debt buyer, the plaintiff provided an affidavit signed by an employee of the debt buyer. An employee of the third-party debt buyer has no familiarity with the underlying debt and cannot make any claim as to the legitimacy of the business records purporting to prove that a debt liability exists. As a result, the affiant cannot adequately confirm the existence or amount of the debt. One court has found such affidavits to be "irrelevant," "insufficient," and "of no probative value."[98] In the cases reviewed in this study, assignee plaintiffs never provided either a copy of the original contract or account statements and never provided an affidavit from the original creditor. In 12% of the cases reviewed, plaintiffs provided an affidavit from "an employee of plaintiff's assignee" with absolutely no reference to who "plaintiff's assignee" is. These affiants are employed by some unknown entity. It does not appear that "plaintiff's assignee" is the original creditor. We reviewed multiple files involving the same affiant but different original creditors and different third-party debt buyers. Like the affidavits from employees of the third-party debt buyers, these lack probative value and should not have been considered "proof" of the plaintiff's claim. Indeed, granting default judgments based on these affidavits contravenes *both* case law *and* the Civil Court Direction cited above, which requires that affidavits of facts be "from a party to the action."[99] These affidavits neither come from a party to the action, nor do they come from a person with personal knowledge of the facts constituting the cause of action. Notably, in two files reviewed, no materials were provided in support of the application for a default judgment. Nonetheless, the default judgments were granted.

Contrary to the standards described above, in support of their applications for default judgments, assignee plaintiffs provided inadmissible evidence that did not support the claims set forward in their complaints. In the cases we reviewed, the affidavits provided in support of plaintiffs' applications for default judgment were made by people who appear to have had no personal knowledge of the underlying facts. As such, they failed to constitute "proof of the facts constituting the claim," as required by section 3215(f) of the Civil Practice Law and Rules. Based on anecdotal evidence provided by attorneys who represent defendants in these cases, where an opposing attorney demands proof that his or her client owes a debt, plaintiffs often fail to produce such evidence and often voluntarily dismiss their actions.

## The Value of Default Judgments

The mean final default judgment amount among files reviewed in our study was $3,063.83. Estimating that there were 320,000 consumer credit cases filed in New York City Civil Court in 2006 and that 80.0% of cases resulted in a default judgment, we can approximate the total impact of default judgments on New Yorkers. In 2006 alone, we estimate that the New York City Civil Court entered judgments worth approximately $784,339,250.77 against New Yorkers in the five boroughs. As a percentage of the amount demanded in complaints filed, just under $1 billion, this represents a staggering success rate for creditors and debt buyers initiating lawsuits in New York City Civil Court and a staggering defeat for New York City consumers.

# PART III: CONCLUSIONS AND POLICY RECOMMENDATIONS

Based on our findings, we make the following conclusions and policy recommendations.

**(1) Fund legal services for low-income and working poor individuals sued on alleged debts in New York City Civil Court. Fund the provision of assistance, information and resources for pro se defendants on-site at each of the five county courthouses.**

Given the massive impact that debt collection litigation has on both individuals and neighborhoods, it is important that individuals have the resources to defend themselves against consumer credit transaction claims. Anecdotal evidence suggests that where consumers are represented by counsel, debt buyers are quick either to settle or to discontinue cases that they may not be able to prove in court. Currently, so few defendants are represented by counsel that it is difficult to know how many defendants have defenses to the claims brought against them by creditors and assignees. There is a dire need for legal services in this area such that people who are already poor and working poor are not further burdened by collection litigation, the monetary impact of which is massive and can be devastating to individual families.

With initial grants from the Skadden Fellowship Foundation and the New York State Interest on Lawyers Account Fund, the members of the Legal Services for the Working Poor Coalition (LSWP), of which the Urban Justice Center is a part,[100] have begun to represent working families with consumer debt problems. Unfortunately, as is too often the case with free legal assistance, the LSWP members are forced to turn away far more families in need of representation in Civil Court involving consumer debt than the groups can represent with current funding levels. Clearly, more funding is needed to make it possible for legal services programs such as LSWP to handle a meaningful number of consumer debt cases.

Given the volume of litigation, however, it is unlikely that every defendant could ever be provided a free attorney. Accordingly, the provision of free legal services must be supplemented with the provision of advice and resources to *pro se* litigants. The Civil Legal Advice and Referral Office (CLARO) currently provides such services for two evening hours a week at the Brooklyn Civil Court and is being expanded to Queens and Manhattan. This program should be expanded to all five boroughs. Further, in addition to evening hours, there should be hours of operation during normal business hours that coincide with the times when cases are calendared so that *pro se* litigants need not come to court multiple times to receive the services they need to defend themselves.

**(2) Clarify the standards required of applications for default judgments.**

Applications for default judgments should be held to applicable standards prior to being granted. At a minimum, plaintiffs should be required to present some admissible proof of their claims and damages sought, as required by section 3215(f) of the Civil Practice Law and Rules. Among cases reviewed in this study, the affidavits that provide the basis for most applications for default judgments in consumer credit transactions are form affidavits. Other than the name of the alleged debtor, the affidavits are largely indistinguishable from

one another. Many do not attest to the assignment of the underlying debt. Most importantly, they constitute inadmissible hearsay. The standards for approving applications for default judgments ought to be clarified. Given the impact of default judgments on defendants' economic health, where such defendants are not present to defend themselves, the importance of ensuring that such judgments are not improperly entered cannot be over-emphasized.

On March 12, 2007, the Civil Court issued a Directive requiring that all consumer credit transaction cases filed in New York County be assigned to a mandatory Mediation Part "[u]pon the filing of an Answer in Person in a consumer credit case for less than $10,000, where the defenses suggest money is owed and a settlement is sought."[101] Prior to March 12, 2007, these cases were "scheduled for a pre-arbitration conference date over eight months away."[102] The mandatory Mediation will take place within 15 days of when the defendant files his or her Answer in Person. Mediations are calendared for Fridays at 10 a.m. Failure by either party to appear is cause for either dismissal or entry of a judgment on default. It is too early yet to know what the effect of this policy will be. Advocates and the court system need to monitor the program, particularly with respect to the ability of defendants to appear in court on a weekday at 10 a.m. to represent themselves at the mediation. In addition, mediators should be trained regarding the elements required to establish a *prima facie* case that a debt is owed so that they are able to evaluate the strength of each party's claims when conducting the mediation.

### (3) Confirm that debt buyers engaging in debt collection litigation must be licensed by the New York City Department of Consumer Affairs.

As this study demonstrates, the failure of debt buyers to substantiate the validity of their claims against alleged debtors and these debt buyers' use of the court system to pursue judgments against these debtors in the absence of adequate proof constitute abusive and unfair practices that ought to be subjected to DCA oversight, licensing requirements, and the possibility that a license will be revoked from companies that abuse consumers and the court system. The New York City Council should clarify that referring an account for litigation constitutes collection activity and that debt buyers that engage in such activity must be licensed by the Department of Consumer Affairs.

The court system has become fertile ground for harassment and abuse. Debt collectors and assignees use the courts to intimidate accused debtors, the vast majority of whom are unrepresented by counsel. To the *pro se* defendant, the simple fact that a debt buyer has filed a lawsuit and is represented by counsel lends an air of legitimacy to the debt buyer's case that can be easily abused. Furthermore, the fact that affidavits in support of default judgments are largely devoid of any evidentiary merit and that debt buyers, when faced with a defendant who has successfully obtained counsel, often discontinue pending litigation, suggests that debt buyers routinely initiate lawsuits based on claims that they cannot prove. Accordingly, debt buyers that initiate litigation in an attempt to collect alleged delinquent debts should be regulated by and required to obtain licenses from the Department of Consumer Affairs. This requirement is, in essence, self-enforcing as unlicensed debt buyers cannot bring debt collection lawsuits in New York State courts.[103]

Furthermore, DCA should require information about litigation practices from debt buyers seeking licensure. For example, DCA ought to inquire about the volume of litigation brought by the applicant; the applicant's business records supporting debt collection claims; and the debt buyers' non-litigation debt collection activities. Debt buyers that abuse the court system should be stripped of debt collection licenses by the Department of Consumer Affairs and, as a result, stripped of the ability to bring debt collection litigation in the New York State courts.[104]

### (4) Further examine the reasons why defendants do not appear to defend themselves in these cases.

Further research is required to determine why alleged debtors fail to appear in court to defend themselves from consumer debt litigation. Anecdotal evidence suggests that often the problem is "sewer

service," the failure of the plaintiff or its process server to serve the defendant. As a result, many defendants are simply not aware that they have been sued. In 1977, recognizing the prevalence of sewer service in this industry, the New York State legislature passed legislation requiring that a notice be mailed to defendants in consumer credit transactions before a default judgment is entered. A later revision of this law indicated that this notice could be sent simultaneously with service of process. Unfortunately, this means that if the original service of process is ineffective, the consumer also never receives this additional required notice and the provision fails to meet its goal of protecting consumers from sewer service.

The problem of sewer service is not limited to consumer debt transactions. It also happens in other contexts, particularly landlord-tenant cases. To address this issue in the Housing Part of New York City Civil Court, section 208.42(i) of the New York City Civil Court Rules requires that when a landlord sues a tenant, the landlord must provide the clerk a stamped postcard, addressed to the tenant, indicating in Spanish and in English that the tenant has been sued and the index number of the case. The court clerk then mails the postcard to the tenant.

Further research is required to determine whether such an approach would be appropriate in the context of consumer credit transactions. Such research could include focus groups or short phone surveys with defendants who have defaulted in these cases. Further study may also reveal whether adding evening hours, as is done in the Small Claims Part of Civil Court, would better serve the needs of litigants in these cases.

### (5) Enact the Exempt Income Protection Act.

In the spring of 2007, New York State Senator Dale Volker and Assemblywoman Helene Weinstein introduced the Exempt Income Protection Act, S.6203/A.8527, in the New York State Senate and Assembly. If enacted, this law would protect bank accounts from restraint by judgment creditors where the funds in the account are exempt from collection under existing New York or federal law. New York and federal laws exempt certain subsistence income from debt collection. Creditors cannot seize income such as Social Security and disability benefits, pensions, public assistance, child support, and Veterans benefits. The exemption laws were enacted to ensure that safety-net income is not diverted from its intended purpose: helping the elderly, disabled and poor to maintain the resources they need for food, rent, medicine and other basic necessities. Despite existing law, each day, bank accounts containing legally exempt income are frozen with "restraining notices" issued after a creditor has obtained a judgment. As a result, hundreds of vulnerable New Yorkers lose access to the funds required for basic needs. Accountholders then experience great difficulty in getting an account released. While New York law provides a straightforward process for judgment creditors to restrain accounts, it does not provide such a process for removing a restraint where the restraint is illegitimate or unlawful.

The Exempt Income Protection Act would prohibit the restraint of bank accounts where the income in the account is exempt from collection under existing law. Further, it would create a streamlined process by which a judgment debtor can ask a court to remove the restraint and require that judgment debtors be notified that such a process exists.

As this study demonstrates, more often than not, judgments in consumer credit litigation are obtained on default. As a result, judgment debtors often have no knowledge that a judgment has been entered against them. Learning that a bank account has been frozen is particularly shocking and debilitating when a person has no knowledge that a judgment has been entered against him or her. When the funds are exempt from collection, freezing an account subjects a person to needless litigation and expense. The sheer volume of default judgments entered in New York City Civil Court suggests that the use of restraining notices and wage garnishments has ballooned over recent years. The Exempt Income Protection Act will limit the use of such enforcement provisions in those inappropriate circumstances where the income in question is exempt. Furthermore, it will create a streamlined procedure for judgment debtors to seek a court order to release funds where the funds have been wrongfully restrained or seized.

**(6) Compensate defendants for fees and costs incurred in defending themselves against frivolous cases.**

Defendants in these cases, whether represented by counsel or not, incur significant expenses in the form of attorney fees and lost wages for time spent appearing in court. Defendants should be reimbursed for these expenses when a plaintiff fails to substantiate its claim. Two provisions in New York law provide for such recovery. Section 5-327 of the New York General Obligations Law provides that "[w]henever a consumer contract provides that the creditor . . . may recover attorney's fees and expenses incurred as the result of a breach of any contractual obligation by the debtor . . . it shall be implied that the creditor . . . shall pay the attorney's fees and expenses of the debtor . . incurred . . . in the successful defense of any action arising out of the contract commenced by the creditor . . . ." In other words, where a credit card agreement allows the credit card issuer or its assignee to recover attorney fees, the law provides an analogous right on the part of the debtor, when he or she successfully defends him or herself against a collection action. Unfortunately, a review of the case law and anecdotal evidence from consumer advocates indicates that this section is rarely applied in consumer debt cases, despite the fact that plaintiffs are routinely awarded litigation costs.

Section 3217 of the New York Civil Practice Law and Rules allows a court to permit discontinuance of an action "upon terms and conditions, as the court deems proper." Plaintiffs routinely seek to discontinue cases where a defendant appears and refuses to settle the case. Defendants, relieved to have the case come to a close, routinely consent to voluntary discontinuances by the plaintiff. Once twenty days have passed since service of the summons, a party must seek a court order to discontinue an action unless all parties agree and sign a stipulation of discontinuance. Where the court orders a discontinuance, it may do so upon such terms and conditions as are just. *Pro se* defendants should be advised that they may seek costs and expenses from the court even where a plaintiff seeks to discontinue. Similarly, the court ought to be sensitive to the burden of litigation on *pro se* defendants, particularly when they are simply unable to afford the resources to defend themselves effectively.

# APPENDICES

## Appendix A: Study Methodology

Using data supplied by the Office of Court Administration, we calculated the percentage of total consumer credit transaction lawsuits filed in New York City Civil Court in each borough in February 2006. According to data received from the Office of Court Administration, there were 897 consumer credit filings in Richmond County; 6,258 filings in the Bronx; 9,083 in Kings County; and 6,092 in Queens. Because New York County maintains data in a different format than do the other four counties, we estimated the percentage of consumer credit transactions filed in New York County in as a percentage of total Civil Part filings in New York County. We did so by assuming that consumer credit transactions constituted the same percentage of total filings in New York County as they did in the four other boroughs. There were 5,188 total filings in the Civil Part of New York County in February of 2006. Accordingly, we estimated the total number of consumer credit filings in New York County in February of 2006 at 2,747 filings.

We then reviewed six hundred randomly selected cases filed in February of 2006. Accordingly, we reviewed 22 files in Richmond County; 148 files in the Bronx; 218 files in Kings County; 146 files in Queens; and 66 files in New York County. These files were selected at random.

## Appendix B: City Council District in Which Defendants Reside

| Borough | District | Council Member | Number of Case Files Reviewed |
|---|---|---|---|
| Manhattan | 1 | Gerson | 5 |
| Manhattan | 2 | Mendez | 4 |
| Manhattan | 3 | Quinn | 9 |
| Manhattan | 4 | Garodnick | 0 |
| Manhattan | 5 | Lappin | 1 |
| Manhattan | 6 | Brewer | 4 |
| Manhattan | 7 | Jackson | 9 |
| Manhattan | 8 | Viverito | 10* |
| Manhattan | 9 | Dickens | 14* |
| Manhattan | 10 | Martinez | 10* |
| Bronx | 11 | Koppell | 12* |
| Bronx | 12 | Seabrook | 26** |
| Bronx | 13 | Vacca | 13* |
| Bronx | 14 | Baez | 22** |
| Bronx | 15 | Rivera | 13* |
| Bronx | 16 | Foster | 23** |
| Bronx | 17 | Arroyo | 18* |
| Bronx | 18 | Palma | 18* |
| Queens | 19 | Avella | 5 |
| Queens | 20 | Liu | 4 |
| Queens | 21 | Monserrate | 14* |
| Queens | 22 | Vallone | 4 |
| Queens | 23 | Weprin | 8 |
| Queens | 24 | Gennaro | 8 |
| Queens | 25 | Sears | 13* |
| Queens | 26 | Gioia | 13* |
| Queens | 27 | Comrie | 14* |
| Queens | 28 | White | 12* |
| Queens | 29 | Katz | 5 |
| Queens | 30 | Gallagher | 7 |
| Queens | 31 | Sanders | 13* |
| Queens | 32 | Addabbo | 12* |
| Brooklyn | 33 | Yassky | 6 |
| Brooklyn | 34 | Reyna | 19** |
| Brooklyn | 35 | James | 23** |
| Brooklyn | 36 | Vann | 24** |
| Brooklyn | 37 | Dilan | 14* |
| Brooklyn | 38 | Gonzalez | 10* |
| Brooklyn | 39 | De Blasio | 5 |

## Appendix B: City Council District in Which Defendants Reside...CONTINUED

| Borough | District | Council Member | Number of Case Files Reviewed |
|---|---|---|---|
| Brooklyn | 40 | Eugene | 16* |
| Brooklyn | 41 | Mealy | 21** |
| Brooklyn | 42 | Barron | 19** |
| Brooklyn | 43 | Gentile | 11* |
| Brooklyn | 44 | Felder | 6 |
| Brooklyn | 45 | Stewart | 13* |
| Brooklyn | 46 | Fidler | 10* |
| Brooklyn | 47 | Recchia | 14* |
| Brooklyn | 48 | Nelson | 10* |
| Staten Island | 49 | McMahon | 10* |
| Staten Island | 50 | Oddo | 7 |
| Staten Island | 51 | Ignizio | 4 |

*: Districts in which we estimate that over 5,000 residents faced consumer credit litigation in 2006
**: Districts in which we estimate that over 10,000 residents faced consumer credit litigation in 2006

SOURCE: Urban Justice Center calculations from review of New York City Civil Court case filings

# ENDNOTES

[1] Because New York State's Civil Practice Law and Rules (hereinafter "CPLR") distinguish cases arising from "consumer credit transactions" from other civil cases, it is possible to track consumer debt litigation in New York State courts. The term "consumer credit transaction" is defined in the New York Civil Practice Law and Rules as "a transaction wherein credit is extended to an individual and the money, property, or service which is the subject of the transaction is primarily for personal, family or household purposes" at section 105(f) of the CPLR. The term covers cases arising from any debts where credit is extended to consumers. It includes credit card debts and also, for example, cell phone debts.

[2] Chief Clerk's Memorandum, *Subject: Bulk Sale of Index Numbers*, Civil Court of the City of New York, August 14, 2006 (responding to surge in filings by initiating procedure for sale of index numbers in bulk), *available at* http://www.courts.state. ny.us/courts/nyc/housing/directives/CCM/ccm167.pdf. In 2006, an estimated 320,000 consumer debt cases were filed in New York City Civil Court. By way of comparison, through 2001, the New York City Civil Court saw, on average, 200,000 filings a year – only a portion of which were consumer debt cases.

[3] Judicial Caseload Indicators, 12-Month Periods Ending September 30, 1997, 2002, 2005, and 2006 *available at* http://www. uscourts.gov/Press_Releases/Judicial_Caseload_Indicators.pdf. This number excludes bankruptcy filings.

[4] Report of the Civil Court of the City of New York, January 1, 1997 – December 31, 2006, *A Decade of Change and Challenge in 'The People's Court' 1997 – 2006* at 17 (hereinafter "*The People's Court*").

[5] *See* discussion *infra* page 5.

[6] CENTER FOR RESPONSIBLE LENDING, THE PLASTIC SAFETY NET: THE REALITY BEHIND DEBT IN AMERICA: FINDINGS FROM A NATIONAL HOUSEHOLD SURVEY OF CREDIT CARD DEBT AMONG LOW- AND MIDDLE-INCOME HOUSEHOLDS 4-5 (2005) (hereinafter "The Plastic Safety Net").

[7] *Id.* at 10.

[8] John Leland, *Couple Learn the High Price of Easy Credit*, THE NEW YORK TIMES, May 19, 2007 at A1; Linda Greenhouse, *The Banks Win in Court*, THE NEW YORK TIMES, June 9, 1996.

[9] *Id.*

[10] Instances of identity theft are often resolved soon after they are identified by the creditor or consumer. Nevertheless, in many cases, an identity theft victim does not learn about a debt ascribed to him or her until the debt is in default, either by checking a credit report, as a result of a lawsuit seeking to collect the debt, or when the creditor seeks to enforce a judgment obtained on default.

[11] Robert M. Hunt, *Collecting Consumer Debt in America*, BUSINESS REVIEW (Q2 2007) at 15, *available at* http://www.philadelphiafed. org/files/br/2007/q2/hunt_collecting-consumer-debt.pdf; Liz Pulliam Weston, *The Basics: 'Zombie Debt' is Hard to Kill*, MSN MONEY, *available at* http://articles.moneycentral.msn.com/SavingandDebt/ManageDebt/ZombieDebtIsHardToKill.aspx.

[12] CPLR § 5222(b).

[13] *See* http://www.smartmoney.com/consumer/index.cfm?story=20010820.

[14] Sarah Ludwig, *Banking and Poverty*, GOTHAM GAZETTE, Sept. 25, 2006, *available at* http://www.gothamgazette.com/article//20060 925/200/1981.

[15] THE NEW YORK CITY COMMISSION FOR ECONOMIC OPPORTUNITY, INCREASING OPPORTUNITY AND REDUCING POVERTY IN NEW YORK CITY 8 (2006) [hereinafter NYC CEO], *available at* http://www.nyc.gov/html/om/pdf/ceo_report2006.pdf.

[16] *Id.* at 14.

[17] *Id.* at 9.

[18] Christian E. Weller, CENTER FOR AMERICAN PROGRESS, PUSHING THE LIMIT: CREDIT CARD DEBT BURDENS AMERICAN FAMILIES 1 (2006), *available at* http://www.americanprogress.org/kf/creditcarddebtreport_pdf.pdf.

[19] *Id.* at 2.

[20] The Plastic Safety Net, *supra* note 6, at 8.

[21] Liz Pulliam Weston, *The Basics: The Truth About Credit Card Debt*, MSN MONEY, *available at* http://moneycentral.msn.com/ content/Banking/creditcardsmarts/P74808.asp.

[22] WELLER, *supra* note 18, at 1.

[23] *Recent Changes in U.S. Family Finances: Evidence from the 2001 and 2004 Survey of Consumer Finances*, 92 FEDERAL RESERVE BULLETIN, at A1, A35 (2006) [hereinafter *Recent Changes*].

[24] Leland, *supra* note 8 at A1.

[25] The Plastic Safety Net, *supra* note 6, at 9.

[26] *See* UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, CREDIT CARDS: INCREASED COMPLEXITY IN RATES AND FEES HEIGHTENS NEED FOR MORE EFFECTIVE DISCLOSURES TO CONSUMERS 59 (2006) [hereinafter GAO]; The Plastic Safety Net, *supra* note 6, at 4. *See also* NYC CEO, *supra* note 15, at 14 (explaining that low-wage service workers, who comprise about a third of the working poor in New York City, are significantly less likely to receive health insurance through an employer as compared to all workers).

[27] Community Service Society Press Release, Making the Rent: Escalating Rents Creating New Hardships for the City's Poor (Dec. 14, 2006), *available at* http://www.cssny.org/news/releases/2006_1214.html.

[28] *See Recent Changes*, *supra* note 23, at A35.

[29] Daniel McGinn, *Maxed Out*, 138 NEWSWEEK 34 (2001).

[30] Furman Center for Real Estate and Urban Policy, *State of New York City's Housing and Neighborhoods 2006* at 2, *available at* http://www.furmancenter.nyu.edu/SOC2006.htm.

[31] Testimony of Travis B. Plunkett, Legislative Director, Consumer Federation of America, before the Committee on Banking, Housing and Urban Affairs of the United States Senate, May 17, 2005.

[32] Rishawn Biddle, *Credit cards: defaults force issuers to beat a retreat*, LOS ANGELES BUSINESS JOURNAL, October 27, 2003, *available at* http://www.thefreelibrary.com/Credit+cards:+defaults+force+issuers+to+beat+a+retreat-a0109847989..

[33] *Id.*

[34] Press Release, Office of the New York State Attorney General, Sub-prime Credit Card Issuer Ordered to Pay Nearly $9 Million in Penalties and Refunds (January 25, 2006), *available at* http://www.oag.state.ny.us/press/2006/jan/jan25a_06.html; Press Release, Office of the New York State Attorney General, Sub-prime Credit Card Issuer to Provide $11 Million in Restitution (July 3, 2006), *available at* http://www.oag.state.ny.us/press/2006/jul/jul3b_06.html.

[35] Cara Matthews, *Lawmakers seek tighter control on credit-card lending practices*, THE JOURNAL NEWS, April 17, 2007, *available at* http://www.thejournalnews.com/apps/pbcs.dll/article?AID=/20070417/NEWS05/704170349/1021.

[36] *Id.*

[37] GAO, *supra* note 26, at 5.

[38] *Id.*

[39] *Id.* at 27.

[40] *Id.* at 38.

[41] 15 U.S.C. § 1692 *et seq.*

[42] New York Gen. Bus. L. §§ 600 *et seq.*

[43] NYC Admin. Code §§ 20-488 *et seq.*

[44] NYC Admin. Code § 20-488.

[45] Centurion Capital Corporation a/a/o Aspire Card v. Druce., No. 29303/2006, 828 N.Y.S.2d 851, 2006 WL 3849021, 2006 N.Y. Misc. LEXIS 3924 (N.Y. City Civ. Ct. Dec. 21, 2006); Department of Consumer Affairs v. Asset Acceptance, LLC, Appeal Determination, Violation Number PL1044927, February 23, 2007.

[46] NYC Admin. Code § 20-488.

[47] *Id.*

[48] Press Release, New York City Department of Consumer Affairs, Department of Consumer Affairs Holds Public Hearing To Explore Debt Collection Practices in New York City (June 12, 2006), *available at* http://www.nyc.gov/html/dca/html/pr2006/pr_061206.shtml.

[49] *Id.*

[50] *See* discussion *infra* page 20.

[51] *See* discussion *supra* page 3. New York City Civil Court has jurisdiction over civil cases involving amounts under $25,000.

[52] *"The People's Court"*, *supra* note 4, at 11.

[53] *Id.* at 20.

[54] For explanation of the term "consumer credit transaction," *see supra* note 1.

[55] The study methodology is described in Appendix A.

[56] *See* discussion *infra* page 21.

[57] The estimated cost to construct the new stadium for the Mets is $780 million. *See* http://www.plannyc.org/project-66-New-Mets-Stadium.

[58] *See, e.g.,* Kimber v. Federal Financial Corp., 668 F. Supp. 1480, 1487 (M.D. Ala. 1987) ("a debt collector's filing of a lawsuit on a debt that appears to be time-barred, without the debt collector having first determined after a reasonable inquiry that that limitations period has been or should be tolled, is an unfair and unconscionable means of collecting the debt"); *see also* Dutton v. Wolhar, 809 F. Supp. 1130 (D. Del. 1992) (finding that debt collector's filing of lawsuit violated the Fair Debt Collection Practices Act).

[59] *Cf.* DAVID UDELL & REBEKAH DILLER, BRENNAN CENTER FOR JUSTICE, ACCESS TO JUSTICE: OPENING THE COURTHOUSE DOOR 4 (2007) (reporting that the main legal services programs turned away at least one person seeking help in civil matters for each person served, and that fewer than one in ten attorneys doing pro-bono work accepts referrals from legal services programs or other organizations serving the low-income community's needs); *see infra* page 16.

[60] Both the New York Civil Practice Law and Rules and the federal Fair Debt Collection Practices Act require that debt collection lawsuits against consumers are brought in the county where the defendant resides.

[61] One defendant secured counsel only after a default judgment was entered against her. After the defendant retained counsel, the court vacated the default judgment.

[62] Council of Better Business Bureaus and Javelin Strategy & Research, 2006 Identity Fraud Survey Report, January 31, 2006, *available in part at* http://www.bbb.org/alerts/article.asp?ID=651.

[63] News Release: ID Analytics Research Shows Highest Rates of U.S. Identity Fraud in New York and the Western States, idAnalytics, February 14, 2007, *available at* http://www.idanalytics.com/news_and_events/20070214a.html.

[64] *Id.*

[65] New York City Civil Court has jurisdiction over cases involving amounts under $25,000.

[66] The terms of this debt purchase are set forth in a Securities and Exchange Commission filing by Asta Funding, Inc *available at* http://www.secinfo.com/dsvr4.u1wz.htm#1stPage.

[67] Hunt, *supra* note 11 at 15.

[68] *See* Rodriguez v. Pressler and Pressler, L.L.P., 06-5103 (E.D.N.Y.), filed September 21, 2006.

[69] *Id.*

[70] This problem is discussed generally at page 18.

[71] Biddle, *supra* note 32.

[72] Federal Trade Commission, FTC Charges One of the Nation's Largest Subprime Lenders with Abusive Lending Practices, March 6, 2001, *available at* http://www.ftc.gov/opa/2001/03/associates.shtm.

[73] *See* In the Matter of Direct Merchants Credit Card Bank, N.A., Consent Order, *available at* http://www.occ.treas.gov/ftp/eas/ea2001-24.pdf

[74] *See* Stipulation and Consent to the Issuance of a Consent Order, In the Matter of First National Bank of Marin (January 24, 2004), *available at* www.occ.treas.gov/ftp/eas/EA2004-45.pdf; Community Reinvestment Act Performance Evaluation, First National Bank of Marin (May 20, 2002) *available at* www.occ.treas.gov/ftp/craeval/apr03/20291.pdf.

[75] *See* discussion *supra* page 6.

[76] *See* http://www.epsilon.com/clients-list.html.

[77] Biddle, *supra* note 32.

[78] Given that plaintiffs rarely produce such agreements, it would be extremely difficult to review the credit card agreements on which these cases are based. *See* discussion *infra* page 20.

[79] Robert Berner, *A big lender's credit card trap,* Business Week, November 6, 2006, *available at* http://www.businessweek.com/magazine/content/06_45/b4008048.htm?chan=search.

[80] *See* Joe Lamport, *Predatory Lending Fuels Rise in Foreclosures,* GOTHAM GAZETTE, April 26, 2007, *available at* http://www.gothamgazette.com/article/housing/20070426/10/2157.

[81] DEMOS, A HOUSE OF CARDS: REFINANCING THE AMERICAN DREAM 3 (2005).

[82] *Id.*

[83] Where a lawsuit is discontinued "with prejudice," it cannot be brought again.

[84] Emily Jane Goodman, *Housing Court: Should Tenants Have a Guaranteed Right to Counsel?,* GOTHAM GAZETTE, Jan. 25, 2006, *available*

*at* http://www.gothamgazette.com/article/law/20060125/13/1735 (11.9% of tenants in New York City Housing Court are represented by counsel).

[85] *Dignity Faces a Steamroller: Small-claims proceedings ignore rights, tilt to collectors,* THE BOSTON GLOBE, July 31, 2006.

[86] Section 3217(a) of the CPLR, which governs voluntary discontinuances, requires that a notice of discontinuance be filed either within twenty days of service of the complaint or before a defendant files and Answer, whichever is *earlier.* In all of the discontinued cases here, the notice of discontinuance was filed well after twenty days had passed and, therefore, in violation of CPLR § 3217(a). Typically, where a plaintiff unilaterally discontinues an action, it maintains the right to reinstitute the action at a later time. If the plaintiff were to seek a court order approving discontinuance, as is required after twenty days have passed, it would be subject to the possibility that the court may discontinue the action with prejudice (so that the plaintiff could not bring the suit again) and with costs.

[87] The CPLR provides as follows: "When a defendant has failed to appear, plead or proceed to trial of an action reached and called for trial, or when the court orders a dismissal for any other neglect to proceed, the plaintiff may seek a default judgment against him." CPLR § 3215(a).

[88] "The clerk, *upon submission of the requisite proof,* shall enter judgment for the amount demanded in the complaint . . . plus costs and interest." *Id.* (emphasis added).

[89] CPLR § 3215(f).

[90] Joosten v. Gale, 129 A.D.2d 531, 535, 514 N.Y.S.2d 729, 732 (1st Dep't 1987).

[91] PRS Assets, a/o Jack LaLanne v. Rodriguez, 2006 NY Slip Op 51148U; 12 Misc. 3d 1172A; 820 N.Y.S.2d 845; 2006 N.Y. Misc. LEXIS 1517 (Dist. Ct. of N.Y., 3d Dist. Nassau County, June 21, 2006) (emphasis added).

[92] Citibank (South Dakota), N.A. v. Martin, 11 Misc. 3d 219; 807 N.Y.S.2d 284 (Civ. Ct. N.Y. Co. 2005) (emphasis added).

[93] *Id.; see also* DeVivo v. Sparago, 287 A.D.2d 535, 536 (2d Dep't 2001) (affirming denial of motion for default judgment).

[94] *Id.*

[95] Levi v. Oberlander, 144 A.D.2d 546, 547, 535 N.Y.S.2d (2d Dep't 1988); *see also* DeVivo v. Sparago, 287 A.D.2d 535, 536 (2d Dep't 2001).

[96] Civil Court Direction, *Subject: Entry of Default Judgments,* Civil Court of the City of New York, January 20, 2000 (emphasis in the original), *available at* http://www.courts.state.ny.us/courts/nyc/civil/directives/DRP/drp154.pdf.

[97] Mullins v. DeLorenzo, 199 A.D.2d 218, 219, 606 N.Y.S.2d 161, 162 (1st Dep't 1993); Joosten v. Gale, *supra* note 90.

[98] Palisades Collection, LLC v. Gonzalez, No. 58564 CV 2004, 2005 N.Y. Misc. LEXIS 2774 (Civ. Ct. N.Y. County, Dec. 12, 2005) *available at* http://www.courts.state.ny.us/reporter/3dseries/2005/2005_52015.htm.

[99] Civil Court Direction, *supra* note 96.

[100] LSWP is made up of the Urban Justice Center, Housing Conservation Coordinators, CAMBA Legal Services and the Northern Manhattan Improvement Corporation.

[101] Directive and Procedures, *Subject: Mandatory Consumer Credit Mediation in New York County,* Civil Court of the City of New York, March 12, 2007, *available at* http://www.courts.state.ny.us/courts/nyc/civil/directives/DRP/drp177.pdf.

[102] *Id.*

[103] CPLR § 3015(e); Centurion Capital Corporation a/a/o Aspire Card v. Druce, 14 Misc. 3d 564, 828 N.Y.S.2d 851 (N.Y. City Civ. Ct. Dec. 21, 2006)

[104] CPLR § 3015(e).



**Community Development Project**
**Urban Justice Center**
123 William Street, 16th Floor
New York, NY 10038
646-602-5600
www.urbanjustice.org/cdp